**EDTECH LAW CENTER PLLC**
Julie Liddell (*pro hac vice forthcoming*)
P.O. Box 300488
Austin, TX 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law

**MORGAN & MORGAN**
Ryan J. McGee (*pro hac vice forthcoming*)
John A. Yanchunis (*pro hac vice forthcoming*)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
rmcgee@forthepeople.com
jyanchunis@forthepeople.com

Michael F. Ram, (CA Bar No. 104805)
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Telephone: (415) 846-3862
mram@forthepeople.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRETCHEN SHANAHAN, on behalf of herself and her minor children A.S. and B.S., AMY WARREN, on behalf of herself and her minor child B.W., and KIMBERLY WHITMAN, on behalf of herself and her minor child H.W., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> IXL LEARNING, INC. <br><br> Defendant. | Civ. No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

*"Above all things I hope the education of the common people will be attended to, convinced that on their good sense we may rely with the most security for the preservation of a due degree of liberty."*

**- Thomas Jefferson to James Madison, 1787**

*"Education is the world's most data-mineable industry by far."*

**- Jose Ferreira, EdTech CEO, May 2014**

*"[EdTech] companies' mission isn't a social mission. They're there to create return."*

**- Michael Moe, EdTech investor, May 2014**

## INTRODUCTION

Defendant IXL Learning, Inc. ("IXL") has built a multibillion-dollar empire by monetizing vast troves of personal information that it has taken from students and their parents[1] without their knowledge or consent.

IXL markets itself as an education technology company, but its core business is collecting as much information as possible about students and their parents and exploiting that information for profit. IXL surveils its users by extracting information through an ever-growing suite of digital-technology products and myriad deceptive design techniques engineered to keep children using its products and providing their information to IXL. IXL then provides that information to its customers, among which are schools and school districts, but also a host of private companies.

IXL and its customers convert that information into intimately detailed profiles on children, which they use to advertise products and services to them, to manipulate how they think and act, to shape their information environment, and to make significant decisions affecting their lives and their futures—all without students or their parents ever knowing.

IXL's massive data-harvesting apparatus exposes parents and school-aged children to serious and irreversible risks to their privacy, property, and autonomy, and harms them in ways that are often invisible but always profound.

Parents and students have not consented to this arrangement. To be effective, consent must be

---

[1] The term "parent" as used herein refers broadly to a child's parent or legal guardian.

both informed and voluntary. Here, it is neither: IXL does not fully disclose to students, parents, or schools what information it collects and what it does with that information. And because parents are required to send their children to school, parents and students are coerced into submitting to IXL's practices.

Schools have always collected subsets of students' personal information in order to provide those same students an education, and they must be able to continue to do so within the bounds of the law. Until recently, that collection was transparent and limited: parents generally knew what information was collected, by whom, and for what purpose, and they could decide if a school crossed a line based on their family's values. But times—and technology—have changed. Schools no longer do the collecting; corporate third parties do. The information taken is not used exclusively for educational purposes; it's used by countless entities for commercial purposes. And the extractive corporate business model does not prioritize positive student outcomes; it prizes "measurability," "scalability," and other corporate-profit imperatives that are often unaligned with and even adversarial to healthy child development. Corporations may not deny parents control over their children's lives by marketing to schools and concealing their practices behind false promises of improving education.

Simply put, school may not come with a clickwrap agreement. By sending their children to school as the law requires, parents do not surrender their authority to decide what personal information may be collected about their children and themselves and how that information may be used. Parents cannot be compelled to offer up their children's lives for unchecked data mining in exchange for the education to which they are legally entitled. IXL must be held to account for operating as though the rights of children and their families are irrelevant.

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 2

JURISDICTION AND VENUE............................................................................................... 6

THE PARTIES ........................................................................................................................ 7

FACTUAL ALLEGATIONS .................................................................................................. 9

I.    The Internet, Data Monetization, and EdTech ................................................................ 9

   A.   The business model of the modern internet ................................................................ 9

   B.   Education is "the world's most data-mineable industry by far."................................ 10

II.   IXL Collects and Monetizes the Data of Millions of School-Age Children and their Parents ................ 11

   A.   IXL has amassed vast troves of student data through school contracts, corporate acquisitions, and other data-sharing agreements. ................................................................ 11

      1.   IXL collects student data through school contracts. .......................................... 11

      2.   IXL obtains student data through corporate acquisitions. ................................... 14

      3.   IXL obtains student data through third-party data-sharing agreements................ 15

   B.   IXL uses children's data for commercial purposes. .................................................. 15

      1.   IXL uses children's data to develop digital products for, and market those products to, current and potential customers, to the detriment of children and their parents. .......................................... 15

      2.   IXL shares the data it collects across its platforms to power its suite of data-derivative products. 18

      3.   IXL shares student data with third-parties for the purpose of product performance, integration, and other commercial purposes as IXL chooses. .................................................. 18

      4.   IXL uses its access to children—and the data it collects from them—for the purpose of marketing to them and gaining marketing insights directly from them. .................................. 20

      5.   IXL purports to grant itself unlimited use of student-created content for its own profit. .............. 22

III.  IXL Fails to Obtain Effective Consent for its Collection and Use of Children's Data ......................... 22

   A.   IXL fails to provide users sufficient information to support informed consent. ...................... 23

      1.   IXL fails to provide users material terms relating to its data practices. ............................ 23

      2.   IXL fails to describe material terms using definite, specific, clear language. ................ 24

      3.   IXL makes false statements about its data practices and commitment to privacy. ................ 26

      4.   IXL fails to disclose risks that its data practices pose to children. .............................. 27

   B.   IXL does not obtain effective parental consent to the collection or use of children's or parents' data.31

      1.   Schools do not own or control the data collected directly from children by IXL, nor have they acted as intermediaries for obtaining parental consent. ..................................... 32

      2.   It is mechanistically *impossible* for parents to provide effective consent to IXL's data practices.. 33

      3.   IXL steers children to its data-mining website. .................................................. 35

   C.   IXL does not provide students or their parents access to, control over, or information about the data IXL collects from them or the information associated with or generated from that data. ...................... 36

D.   IXL's Terms of Service are constantly changing without notice to, or consent from, parents. ............ 37

IV.   IXL's conduct harms children and their parents. ................................................................. 37

A.   IXL's failure to obtain parents' informed consent to its collection and use of their data harms families. 37

B.   IXL's nonconsensual data practices harm children. ..................................................... 38

1.   IXL harms children by subjecting them to marketing. .............................................. 38

2.   IXL harms children by continuously surveilling them. .............................................. 39

C.   IXL's nonconsensual data practices harm parents by abridging their right to parent as they choose. . 41

D.   IXL's nonconsensual data practices harm families. ..................................................... 42

1.   IXL harms families by invading their privacy. ........................................................ 42

2.   IXL's harms families by denying them access to their data and subjecting them to practices that are opaque, unreviewable, and unappealable. ........................................................ 43

3.   IXL harms families by forcing them to choose between a child's right to an education and other fundamental rights. ................................................................................. 43

4.   IXL harms families by failing to compensate them for their property and labor. ........................ 45

E.   IXL's nonconsensual data practices are unfair and unlawful. .......................................... 46

V.   Plaintiff-Specific Allegations ............................................................................. 46

A.   Plaintiffs use IXL products, which collect and use Plaintiffs' data. .................................. 46

B.   Plaintiffs did not consent to IXL's collection and use of their data. ................................ 47

C.   IXL denied Plaintiffs access to, review of, and control over their data. .............................. 47

D.   Plaintiffs were harmed by IXL's collection and use of their data. ..................................... 47

CLASS ACTION ALLEGATIONS ................................................................................. 48

CAUSES OF ACTION ........................................................................................... 51

Count I: Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* .................................. 51

Count II: Violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632 ......... 53

Count III: Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code §§ 502, et seq. ............................................................................................ 55

Count IV: Invasion of Privacy ................................................................................. 56

Count V: Intrusion Upon Seclusion ........................................................................... 58

Count VI: Violation of California's Unfair Competition Law ("UCL") Cal. bus. & Prof. code § 17200, et seq. 59

RELIEF REQUESTED ........................................................................................... 60

JURY TRIAL DEMAND .......................................................................................... 60

1.    Plaintiffs Gretchen Shanahan, on behalf of herself and as parent and guardian of her minor children, A.S. and B.S., Amy Warren, on behalf of herself and as parent and guardian of her minor child, B.W., and Kimberly Whitman, on behalf of herself and as parent and guardian of her minor child, H.W., as well as on behalf of all other similarly situated individuals ("Plaintiffs"), by and through their attorneys, bring this class action complaint for injunctive and monetary relief under Federal Rule of Procedures 23(b)(2) and 23(b)(3) against IXL Learning, Inc., ("IXL") and make the following allegations based upon knowledge as to themselves and the acts of themselves and their minor children, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

2.    This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant IXL.

3.    Venue is proper in this District under 28 U.S.C. § 1391 because IXL is subject to personal jurisdiction here, and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

4.    Further, the unlawful conduct alleged in this Class Action Complaint occurred in, was directed to and/or emanated in part from this District. Sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its promotion, sales, licensing, activities and marketing within this state. IXL purposely availed itself of the laws of California, and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to persons throughout the United States, including persons IXL knew or had reason to know are located in California (including in this District).

5.    Moreover, IXL's Terms of Service mandate that the provision of IXL's service is "deemed solely based in California" and only California courts have personal jurisdiction over IXL.[2]

---

[2] IXL Learning, *Terms of Service*,  https://www.ixl.com/termsofservice.

## THE PARTIES

6.      Plaintiff A.S. is a minor. At all relevant times, she has been domiciled in the state of Kansas. Plaintiff A.S. attends school in the Shawnee Mission Public School District. As part of her public schooling, she is required to access and use IXL products and services, which she has accessed and used from her school-issued device. Plaintiff A.S. was never informed about IXL's data practices nor was she ever asked for her consent to those practices. As of the date of this filing, Plaintiff A.S. still does not know the full extent of the information that IXL has collected about her, where or how long it is stored, how it is used, or who has access to it. Plaintiff A.S. has at no time knowingly or voluntarily consented to IXL's data practices.

7.      Plaintiff B.S. is a minor. At all relevant times, he has been domiciled in the state of Kansas. Plaintiff B.S. attends school in the Shawnee Mission Public School District. As part of his public schooling, he is required to access and use IXL products and services, which he has accessed and used from his school-issued device. Plaintiff B.S. was never informed about IXL's data practices nor was he ever asked for his consent to those practices. As of the date of this filing, Plaintiff B.S. still does not know the full extent of the information that IXL has collected about him, where or how long it is stored, how it is used, or who has access to it. Plaintiff B.S. has at no time knowingly or voluntarily consented to IXL's data practices.

8.      Plaintiff Gretchen Shanahan is the mother and legal guardian of Plaintiffs A.S. and B.S. At all relevant times, she has been domiciled in the state of Kansas. At no time did IXL notify Plaintiff Shanahan that Plaintiffs A.S. or B.S. were using IXL products and services as part of their education, inform her about IXL's data practices, or ask her to consent to those practices on behalf of herself, A.S., or B.S. Despite reasonable efforts, as of the date of this filing, Plaintiff Shanahan still does not know the full extent of the information that IXL has collected about herself, Plaintiff A.S., or Plaintiff B.S., where or how long it is stored, how it is used, or who has access to it. Plaintiff Shanahan has at no time knowingly and voluntarily consented to IXL's data practices.

9.      Plaintiff H.W. is a minor. At all relevant times, she has been domiciled in the state of Kansas. Plaintiff H.W. attends school in the Shawnee Mission Public School District. As part of her

public schooling, she is required to access and use IXL products and services, which she has accessed and used from her school-issued device. Plaintiff H.W. was never informed about IXL's data practices nor was she ever asked for her consent to those practices. As of the date of this filing, Plaintiff H.W. still does not know the full extent of the information that IXL has collected about her, whether such information is accurate, where or how long it is stored, how it is used, or who has access to it. Plaintiff H.W. has at no time knowingly or voluntarily consented to IXL's data practices.

10.   Plaintiff Kimberly Whitman is the mother and legal guardian of Plaintiff H.W. At all relevant times, she has been domiciled in the state of Kansas. At no time did IXL notify Plaintiff Whitman that Plaintiff H.W. was using IXL products and services as part of her education, inform her about IXL's data practices, or ask her to consent to those practices on behalf of herself or Plaintiff H.W. Despite reasonable efforts, as of the date of this filing, Plaintiff Whitman still does not know the full extent of the information that IXL has collected about herself or Plaintiff H.W., where or how long it is stored, how it is used, or who has access to it. Plaintiff Whitman has at no time knowingly or voluntarily consented to IXL's data practices.

11.   Plaintiff B.W. is a minor. At all relevant times, he has been domiciled in the state of Kansas. Plaintiff B.W. attends school in the Wichita Unified School District 259. As part of his public schooling, he is required to access and use IXL products and services, which he has accessed and used from his school-issued device and personally owned devices. Plaintiff B.W. was never informed about IXL's data practices nor was he ever asked for his consent to those practices. As of the date of this filing, Plaintiff B.W. still does not know the full extent of the information that IXL has collected about him, where or how long it is stored, how it is used, or who has access to it. Plaintiff B.W. has at no time knowingly or voluntarily consented to IXL's data practices.

12.   Plaintiff Amy Warren is the mother and legal guardian of Plaintiff B.W. At all relevant times, she has been domiciled in the state of Kansas. At no time did IXL notify Plaintiff Warren that Plaintiff B.W. was using IXL products and services as part of his education, inform her about IXL's data practices, or ask her to consent to those practices on behalf of herself or B.W. Despite reasonable efforts, as of the date of this filing, Plaintiff Warren still does not know the full extent of the

information that IXL has collected about herself or B.W., where or how long it is stored, how it is used, or who has access to it. Plaintiff Warren has at no time knowingly and voluntarily consented to IXL's data practices.

13.    Defendant IXL is Delaware corporation. Its headquarters are located at 777 Mariners Island Blvd., Suite 600, San Mateo, California 94404.

## FACTUAL ALLEGATIONS

### I.    The Internet, Data Monetization, and EdTech

#### A.    The business model of the modern internet

14.    For two decades, vast numbers of consumer-facing technology companies have built their businesses around what Harvard Business School professor emerita Shoshana Zuboff has described as "surveillance capitalism."[3]

15.    Under surveillance capitalism, a technology provider is incentivized to:

- collect as much data as possible about a user though the user's interaction with the technology provider's platform;

- use the data the technology provider collects about the user to make predictions about that user's future behavior, which the technology provider uses to build its own products and services and sells to third parties seeking to profit from that user;

- surreptitiously influence the user's behavior using what it knows about the user—both to keep the user on the platform longer (increasing the amount of information available to collect) and to coerce the user to act as the technology provider has predicted (increasing the value of the provider's insights); and

- enable third parties to make significant decisions about the user that can affect their life and future.

16.    Submission to this arrangement has become the cost of being online: in order to use the internet, an individual must "consent" to having these intimate dossiers built about them, which

---

[3] The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power, Shoshana Zuboff (2019).

are used by countless entities to identify and target them, make predictions about them, manipulate their behavior, and influence decision-making about them.

17.     Given the extractive and exploitative nature of the surveillance-capitalist business model,[4] its viability depends on keeping the public in the dark. Companies thus employ numerous tactics to keep users engaged and uninformed, such as opaque terms of service, click- and browse-wrap "agreements," hidden data-collection technologies, and manipulative design techniques.

18.     The practices of surveillance capitalism have become commonplace—not just in technology domains like search, ecommerce, and social media—but also in more traditional domains such as healthcare, employment, lending, and insurance. Courts have routinely found undisclosed corporate practices in these domains to be unlawful. And if the surveillance business model is unfair when used against adults in ostensibly voluntary consumer contexts, it is unconscionable when used against school-age children in the compulsory setting of K-12 education.

**B.     Education is "the world's most data-mineable industry by far."**

19.     The surveillance-capitalist business model also underpins digital-technology platforms used in elementary, middle, and high schools across the U.S.

20.     Simply by attending school as is their legal right and obligation, children are subjected to the same intrusive and exploitative data practices as adults in non-compulsory settings: reams of their personal information are harvested to build intimately detailed profiles about them, which are then used by the collecting company, schools, and a host of other third parties to identify, target, manipulate, and influence decision-making about them.

21.     By collecting and monetizing children's information, education technology, or

---

[4] "Surveillance-capitalist business model" and "data-monetization business model" are used interchangeably herein.

"EdTech,"[5] has become a $250 billion global industry that is projected to nearly triple by 2027.[6]

22.     Investors have taken note. Investments in EdTech have surged from $500 million in 2010 to $16.1 billion in 2021.[7]

23.     Rather than describing a defining aspect of any digital-technology service or product, "EdTech" describes the market that these companies target, namely, schools and school districts.

24.     Education has been described by a leading executive as "the world's most data-mineable industry by far."[8]

25.     As one leading EdTech investor explained, these investments are not philanthropic: the purpose of these private EdTech ventures "isn't a social mission . . . . They're there to create return."[9]

**II.    IXL Collects and Monetizes the Data of Millions of School-Age Children and their Parents**

**A.    IXL has amassed vast troves of student data through school contracts, corporate acquisitions, and other data-sharing agreements.**

26.     IXL is an EdTech platform specializing in data collection and analytics.

**1.    IXL collects student data through school contracts.**

27.     IXL's primary customers are schools and school districts.[10]

28.     By persuading those customers to implement its products in schools, IXL gains

---

[5] Although the term "educational technology" can be defined broadly to include purely theoretical or pedagogical practices, this Complaint uses "EdTech" to refer generally to "all the privately owned companies currently involved in the financing, production and distribution of commercial hardware, software, cultural goods, services and platforms for the educational market with the goal of turning a profit." *EdTech Inc.: Selling, Automating and Globalizing Higher Education in the Digital Age*, Tanner Mirrlees and Shahid Alvi (2019).

[6] Louise Hooper, et al., *Problems with Data Governance in UK Schools*, Digital Futures Commission, 5Rights Foundation (2022), https://digitalfuturescommission.org.uk/wp-content/uploads/2022/08/Problems-with-data-governance-in-UK-schools.pdf.

[7] Alex Yelenevych, *The Future of EdTech*, Forbes (December 26, 2022), https://www.forbes.com/sites/forbesbusinesscouncil/2022/12/26/the-future-of-edtech/?sh=7c2924676c2f.

[8] Stephanie Simon, *The big biz of spying on little kids*, Politico (May 15, 2014), https://www.politico.com/story/2014/05/data-mining-your-children-106676.

[9] *Id*.

[10] IXL also markets certain products to parents, but those products are not the subject of this suit.

virtually unfettered access to the data of the children who attend those schools.

29.     Millions of school-age children use IXL products. IXL claims to reach 15 million students in the U.S. alone.

30.     IXL does not fully disclose what data—or even categories of data—it collects from school-age children or their families.

31.     IXL refuses to make the data it collects from children—or the information it generates using that data—available to children or their parents for review.

32.     At minimum, IXL states that it collects the following information from and about its users:

- student names or other identifiers;
- passwords;
- e-mail address for the student or the student's parent or legal guardian;
- educational level and topic of study;
- information about your use of the Service;
- any information that you submit to the Service, such as answers to questions or content or messages posted or shared through the Service;
- personal information collected when users contact our technical support team, send us an e-mail, complete a user survey or otherwise communicate with IXL;
- information about how you access and use the Service, for example:
  - referring / exit pages;
  - URLs;
  - how frequently you access the Service;
  - the pages you view;
  - the links you click; and
  - other actions you take on the Service);
- information about your browser;
- information about the device(s) you use to access the Service, for example:

- o   Internet Protocol (IP address);
- o   browser type;
- o   browser language;
- o   Internet service provider;
- o   device type; and
- o   model and manufacturer;
- a unique ID that allows us to uniquely identify:
  - o   your browser;
  - o   your device;
  - o   your account;
  - o   your operating system brand and model; and
  - o   whether you access the Service from multiple devices;
- information about your geographical location data;
- analytics data;
- information as directed by schools; and
- "sensitive" information such as "gender, race, ethnicity."

33.   This data, when aggregated and processed, enables IXL to build dynamic, robust, and intimate dossiers of users, including children and their parents.

34.   IXL then uses, markets, and sells those dossiers to third parties to identify and target those users with precision and make predictions about them for the purposes of manipulating their behavior and influencing decision-making that affects their lives now and in the future.

35.   Further, students may log on to IXL's platforms using family-owned devices, enabling IXL's tracking technologies to harvest data about those devices and users of those devices—such as students' household members—as well. And because its platforms are accessible anywhere, IXL may track children wherever they go, including their own homes.

36.   This blending of information—where data from an adult's device might be cross-populated with the dossier of a school-aged child—only further illustrates the harms of this data

collection, aggregation, and sale to third parties: data that is traditionally associated with an older, more mature group of individuals is blended with the dossiers (and behavioral targeting) of adolescent children without any oversight by their parents. Worse, after that data is aggregated and associated with the minor children, there is no understanding of what IXL and other data companies do with that information for behavioral targeting or for other undisclosed purposes.

**2.    IXL obtains student data through corporate acquisitions.**

37.    IXL has also obtained substantial amounts of student data through a series of strategic corporate acquisitions.

38.    IXL has spent more than $135 million in corporate acquisitions. Since 2018, it has acquired nine companies.

39.    Its first acquisition was ABCya, a platform built in 2004 that has reached over 122 million pre-K through sixth grade students. The acquisition helped IXL gamify its "integrated learning" platform.[11]

40.    In 2019, IXL completed the acquisition of Education.com, an online learning resource that, at the time, claimed to have reached 23 million teachers and parents.[12] In 2022, IXL acquired Curiosity Media, which claims to serve more than 100 million people each year with language resources.[13]

41.    That same year, IXL acquired Emmersion, a company specializing in AI-powered language-assessment technology.[14] In addition to providing assessments of students' language

---

[11] IXL Learning, *IXL Learning Acquires ABCya, Expands its Game-Based Learning Offerings*, PR Newswire (October 30, 2018), https://www.prnewswire.com/news-releases/ixl-learning-acquires-abcya-expands-its-game-based-learning-offerings-300739749.html.

[12] IXL Learning, *IXL Learning Acquires Learning Resources Platform Education.com*, PR Newswire (November 18, 2019), https://www.prnewswire.com/news-releases/ixl-learning-acquires-learning-resources-platform-educationcom-300960144.html

[13] IXL Learning, *IXL Learning Acquires Language Learning Software Developer Curiosity Media*, PR Newswire (June 10, 2022), https://www.prnewswire.com/news-releases/ixl-learning-acquires-language-learning-software-developer-curiosity-media-301565900.html.

[14] IXL Learning, *IXL Learning Acquires Emmersion, Developer of AI-Powered Language Assessments*, PR Newswire (September 8, 2022), https://www.prnewswire.com/news-releases/ixl-learning-acquires-emmersion-developer-of-ai-powered-language-assessments-301620949.html.

learning, Emmersion offers pre-employment language assessments to employers "to make hiring decisions fast."[15]

42.     IXL's data trove now includes data from these companies and numerous others.

43.     These acquisitions—and the data they collected and continue to confer—are essential to IXL's data-monetization business model.

### 3.     IXL obtains student data through third-party data-sharing agreements.

44.     IXL also partners with a variety of other third parties in the joint collection, analysis, and use of student data. For example, it uses Google Analytics to (1) measure traffic and usage trends for the service and (2) understand the demographics and behaviors of its users.

45.     IXL also works with third parties to employ technologies, including the application of statistical modeling tools, which enable IXL to recognize and contact users across multiple devices.

### B.     IXL uses children's data for commercial purposes.

### 1.     IXL uses children's data to develop digital products for, and market those products to, current and potential customers, to the detriment of children and their parents.

46.     Like most surveillance-technology companies, IXL does not collect user data for the purpose of providing the raw data itself to third parties nor for the limited purpose of assisting families with their children's educational pursuits. Instead, it collects, combines, and analyzes children's data for the purpose of building highly detailed and intimately personal dossiers of children, which they use to generate predictions about a child's life.

47.     IXL sells predictions concerning a wide range of a child's attributes and behaviors, such as her future academic performance, skill mastery, learning comprehension, interests, risks, behavior, college and job readiness, and more. These predictions are variously described as "insights," "analytics," "diagnostics," "assessments," "products," "offerings," "solutions," "guidance," and other such intentionally esoteric, anodyne terms.[16]

---

[15] Emmersion: Automated Language Testing, https://emmersion.ai/.
[16] *See, e.g.*, Cathy O'Neil, *Weapons of Math Destruction*, (2016); Zuboff, *The Age of Surveillance Capitalism*.

48.     It is these data-derived digital products that IXL provides its customers (including schools), who use them to identify, target, manipulate, make decisions about, and otherwise monetize children and their personal information.

49.     For schools, such purposes include, but are not limited to, automating core facets of education, such as assessment of learning and comprehension, development of "personalized" curricula, student management and oversight, and other fundamental aspects of school administration and pedagogy.

50.     IXL claims that its predictive models "provide[] a far clearer and more insightful portrait of students' knowledge than any other test[.]"[17]

51.     Although IXL markets these products as conferring to schools and school districts administrative and pedagogical benefits, they are undeniably commercial, for-profit products that have enabled IXL to build a multibillion-dollar surveillance-technology empire, all under the guise of improving education.

52.     IXL uses children's personal information for the commercial purpose of product development. It states that it "use[s] information [it collects] to . . . perform research, and to develop, support, and improve our Service and other educational products and services."[18]

53.     IXL uses children's personal information for commercial marketing purposes. It states that it "use[s] information [it collects] to demonstrate the effectiveness of the Service[.]"[19]

54.     IXL stores the information it collects in perpetuity, or until it determines it is no longer of value to the company.[20]   Crucially, however, those whose data IXL has taken have no ability to delete or otherwise remove this information from IXL's systems and possession or those of third parties that have received it from IXL.

55.     Enabled by its ever-growing trove of student data, the IXL suite of products now

---

[17] IXL Learning, Release of IXL Diagnostic (August 21, 2017),
https://www.ixl.com/assets/company/IXL_Releases_the_IXL_Diagnostic.pdf.
[18] IXL Service Privacy Policy (July 1, 2020),
https://www.ixl.com/privacypolicy/serviceprivacypolicy.
[19] *Id.*
[20] *Id.*

includes more than a dozen data-derived products, including but not limited to, the following:

- **Comprehensive Curriculum**—developed over more than ten years, IXL's curriculum product purportedly supports "nearly any learning need from pre-K through 12th grade." IXL uses student data to create adaptive, dynamic curricula that "adapts to learners as they grow[.]"[21]

- **Real-Time Diagnostic**—supported by the Comprehensive Curriculum, IXL's diagnostic product is "a new kind of assessment" that "assesses students at a deep level, providing "reliable insights" on their proficiency in various skills. It is marketed for use by districts and schools for benchmarking "or throughout the year as an instructional diagnostic."[22]

- **Actionable Analytics**—marketed as delivering to teachers "data-driven instruction" that is individually tailored to each student. It provides reports that are intended to be used to monitor learning and "group students" by performance. IXL further claims that this product helps school administrators collect data on student performance and "facilitate successful IXL implementations[.]"[23]

- **Personalized Guidance**—gathers and processes data collected through students' use of the curriculum and diagnostic products to create "personalized action plans for each learner[.]" IXL markets this product as enabling teachers to make decisions affecting students' learning and "pathway for growth[.]"[24]

56.     Other products and services include Rosetta Stone, TPT, Wyzant, Vocabulary.com, ABCya, SpanishDict, Emmersion, and Education.com.

57.     These products are made possible only through IXL's sweeping collection, retention, disclosure, and use of children's data.

---

[21] IXL, *One platform, endless possibilities*,
https://go.boarddocs.com/ks/kckps/Board.nsf/files/CRFLU3582F19/$file/IXL%20for%20Districts%20Information%20Booklet.pdf
[22] IXL, Product Info Sheet, https://www.ixl.com/membership/Product-Info-Sheet.pdf.
[23] *Id*.
[24] *Id*.

**2.    IXL shares the data it collects across its platforms to power its suite of data-derivative products.**

58.    To power its massive and growing suite of data-derivative products and provide its customers access to granular student analytics, IXL compiles the data it collects through each of its platforms and uses it to build, improve, and market its suite of products third parties.

59.    Student data collected through IXL's platforms is not segregated, and the collection and use of that data is not limited to only the platforms and products licensed by schools. Rather, IXL consolidates all of the data it collects from schools and directly from students to enhance its suite of products to facilitate deeper and more individualized analytics, which are marketed to third parties as enabling greater targeting of, and decision-making about, students.

60.    This aggregation and sharing of data is core to IXL's data-monetization business model.

**3.    IXL shares student data with third-parties for the purpose of product performance, integration, and other commercial purposes as IXL chooses.**

61.    IXL states that it shares student data with third-party vendors, service providers, and individuals "to provide services or products for us or on our behalf[.]"[25]

62.    IXL markets "[e]ffortless integration" of its products with a host of other technology products used by schools. IXL claims to "seamlessly integrate[]" with other surveillance-technology products including, but not limited to, Canvas by Instructure, Inc., Schoology by PowerSchool, LLC, and various school-marketed products by Google.[26]

63.    IXL states, only with respect to California residents, that it does "not 'sell' personal information to third parties without consent" (without identifying what it considers "personal information," what constitutes a "sale," or whose consent it purportedly obtains), permitting the reasonable inference that it does sell non-California resident users' personal information to third

---

[25] IXL Learning, IXL Service Privacy Policy (July 1, 2020),
https://www.ixl.com/privacypolicy/serviceprivacypolicy,
[26] IXL Learning, Effortless integration with IXL,
https://www.ixl.com/membership/administrators/tech-integration.

parties without consent.[27]

64.     It further states, only with respect to California residents, that it does "not sell the personal information of consumers we know to be less than 16 years of age, unless we receive affirmative authorization . . . from either the minor who is between 13 and 16 years of age, or the parent or guardian of a minor less than 13 years of age," (without identifying what it considers "personal information" or what constitutes a "sale") again permitting the reasonable inference that it does sell the personal information of children under 16 without parental consent—or the consent of minors, who cannot legally consent.[28]

65.     IXL admits that it "allow[s] certain third party advertising networks and other third party businesses to collect your personal information directly from your browser or device through cookies and related technologies for advertising, attribution, analytics and research purposes."[29] It states that "[t]hese third parties may use such personal information for their own purposes in accordance with their own privacy statements, which may include reselling this information to additional third parties."[30]

66.     Crucially, IXL does not provide these disclosures in a concise, easy-to-understand manner. Instead, IXL may disclose some of its practices in one page of its Terms of Service, another in its Privacy Policy, and yet another in another location, making it impossible for parents to understand and appreciate the extent of IXL's data collection, aggregation, and sales practices. Without a fulsome understanding, those parents and any other party from whom IXL might have sought consent resulted from, at best, a cabined misunderstanding of IXL's practices that did not constitute effective consent.

---

[27] IXL Learning, IXL Service Privacy Policy (July 1, 2020),
https://www.ixl.com/privacypolicy/serviceprivacypolicy,
[28] *Id.*
[29] *Id.*
[30] *Id.*

**4.    IXL uses its access to children—and the data it collects from them—for the purpose of marketing to them and gaining marketing insights directly from them.**

67.    IXL targets children with advertisements through and for its own products.

68.    For example, a child's school-licensed IXL dashboard contains countless "testimonials" promoting IXL:



69.    The child's dashboard also conscripts children into providing marketing insights. It features persistent links to a marketing survey about IXL products and services. The survey includes more than a dozen leading questions intended to solicit highly personal information (that is favorable to IXL), such as their grade, "[w]hat do you like most about IXL," "[h]ow has IXL helped you become a more successful learner," their "biggest challenges as a student," and, if they are not using "Real-Time Diagnostics," to explain why not.

70.    IXL then converts that child-provided data into an endless scroll of "student testimonials," which it uses to market directly to other children through their IXL dashboard:



71.     If a child's school-licensed account is deactivated, IXL appeals directly to the child in an effort to persuade them to seek re-activation of their account:

72.     IXL thereby enlists children to either (1) contact the school for re-activation, without

parental consent, or (2) provide their parents' contact information for the purpose of sending them marketing information.

73.     The child's dashboard even targets the child using her[31] own name:



74.     IXL thus uses children's data to market to children and solicit marketing insights from them, all through school-licensed student accounts.

**5.     IXL purports to grant itself unlimited use of student-created content for its own profit.**

75.     IXL claims "a royalty-free, sublicensable, transferable, perpetual, irrevocable, non-exclusive, worldwide license to use, reproduce, modify, publish, list information regarding, edit, translate, distribute, syndicate, publicly perform, publicly display, and make derivative works of all" children created in connection with the IXL service "whether now known or hereafter developed . . . including without limitation for promoting and redistributing part or all of the Service (and derivative works thereof) in any media formats and through any media channels."

**III.   IXL Fails to Obtain Effective Consent for its Collection and Use of Children's Data**

76.     IXL fails to obtain informed, ongoing consent for its sweeping collection and use of children's data. Specifically, IXL fails to (1) provide users sufficient information to support informed

---

[31] This is an exemplar and not associated with Plaintiffs or their minor children.

consent, (2) obtain consent from a person with authority to do so, (3) permit users to access data collected from them and information generated about them, and (4) notify users of changes to material terms and obtain consent to those modifications.

**A.    IXL fails to provide users sufficient information to support informed consent.**

77.    IXL does not make informed consent possible because it does not provide users the quality of quantity of information regarding its data practices necessary to support informed consent.

78.    IXL fails to provide a clear, comprehensive, and exclusive list of (1) the data or categories of data it collects on users; (2) the ways in which it will use such data; (3) the entities that will have access to such data; and (4) the risks that its data practices pose to children.

79.    IXL's Terms of Use and related privacy statements are deficient because they (1) fail to disclose material terms pertaining to its practices; (2) fail to describe material terms using specific, definite, and clear language; and (3) include false statements about IXL's data practices.

80.    Below are some illustrative ways in which IXL intentionally denies users the ability to fully understand its data practices.

**1.    IXL fails to provide users material terms relating to its data practices.**

81.    Instead of disclosing material terms necessary to support informed consent, IXL's Terms of Use and incorporated policies frequently refer to information that is not available for users to review.

82.    The Service Privacy Policy (which governs school-licensed IXL products) alone contains numerous references to agreements between IXL and schools, school districts, and unidentified third parties that pertain to critical information regarding IXL's data practices, such as follows (emphasis added):

- Our collection, use and sharing of Student Data is governed by our ***contracts with the School***;

- We share information with consent and ***at the direction of*** Schools;

- IXL will not knowingly retain Student Data beyond the time period required to support ***the School's purpose***;

- we collect, retain, use and disclose Student Data only for or on behalf of our School customers for the purpose of providing the Services **specified in our agreement with the School** and for no other commercial purpose;

- When IXL provides the Service to Schools, our collection, use and disclosure of Student Data is governed by our Terms of Service and/or **any other agreement with the School**;

- IXL does not collect, maintain, use or share Student Data beyond that needed for an authorized educational or school purpose, or **as authorized by our agreement with a School**;

- We do not delete or de-identify any Student Data from an active student user account associated with a School except **at the direction of the School**;

- we do allow certain **third party advertising networks and other third party businesses** to collect your personal information directly from your browser or device through cookies and related technologies for advertising, attribution, analytics and research purposes. These third parties may use such personal information for their own purposes **in accordance with their own privacy statements**, which may include reselling this information to additional third parties;

- Such vendors will only be provided personally identifiable information to the extent necessary for them to provide their **contracted-for services**[.]

83.     These representations fail to provide users critical information relating to IXL's collection, use, and disclosure of users' data, rendering informed consent impossible.

> **2.     IXL fails to describe material terms using definite, specific, clear language.**

84.     IXL defines terms material to its data practices using vague, undefined, open-ended, and contradictory language, such as follows (emphasis added):

- IXL explains that "**[p]ersonal information** collected from or about students, along with **other information** associated with that personal information is "Student Data." However, instead of identifying what information is collected or "associated" with that information,

IXL states that "[t]he School may elect to provide user names or identifiers which are not readily identifiable to anyone outside of the School community in lieu of a full student name, at its discretion," leaving entirely open the question of what information IXL collects directly from students.

- IXL provides services to schools "for ***educational purposes***."

- IXL states that, "***in general***," it does not use student data "for any purpose other than improving and providing our Services to the School or on the school's behalf."

- "IXL may share or disclose your personal information ***as needed to provide our Service***[.]"

- IXL variously states that it does use user data for commercial purposes such as marketing and that it does not use user data for such purposes.

- IXL states that it "will not knowingly retain Student Data beyond the time period required to support an educational purpose, unless authorized by a School or parent."

- IXL states that it "will retain personal information for as long as needed to provide the Service ***and for our internal business purposes***, which may extend beyond the termination or cancellation of your subscription or user account."

85.    Instead of providing comprehensive, exclusive descriptions of its data practices as would be necessary to permit full understanding of those practices, IXL provides singular, benign examples (emphasis added):

- We use your information to provide transactional notifications for certain activities relating to your use of our Service. ***For example***, we may send e-mail notifications when a user completes an activity, to provide receipt for payment or other subscription notices.

- ***For example***, a School . . . may direct IXL to share specific information with another individual, ***such as*** when a teacher directs IXL to send a communication to a parent.

- [W]e may share personal information with third parties, ***for example***, if a School authorizes Google login or similar authentication tools for that School's user accounts.

- IXL may share information with our trusted vendors, third party service providers and

individuals to provide services or products for us or on our behalf, which ***may include*** analytics, hosting, billing, targeted advertising, and marketing (provided however, that IXL will not knowingly use any Student Data to target advertising or marketing).

### 3. IXL makes false statements about its data practices and commitment to privacy.

86. IXL's privacy policies repeatedly assure parents that it protects and prioritizes children's privacy.

87. IXL falsely states that it "will clearly and transparently disclose our data policies and practices."

88. IXL falsely states that it "will not knowingly use any Student Data to target advertising or marketing."

89. IXL falsely states that "IXL does not display any targeted advertising on the Service."

90. IXL falsely states it "take[s] many steps to prevent these third-party advertising networks from collecting information for targeted advertising purposes once a subscriber to our Service signs into our Service."

91. IXL also touts that it is a signatory to the 2020 Student Privacy Pledge.[32] The Privacy Pledge contains a number of privacy commitments, including:

- "We will not collect, maintain, use or share Student PII beyond that needed for authorized educational/school purposes, or as authorized by the parent/student."

- "We will not sell student PII."

- "We will not use or disclose student information collected through an educational/school service (whether personal information or otherwise) for behavioral targeting of advertisements to students."

- "We will not build a personal profile of a student other than for supporting authorized educational/school purposes or as authorized by the parent/student."

- "We will disclose clearly in contracts or privacy policies, including in a manner easy for

---

[32] IXL Learning, IXL Service Privacy Policy (July 1, 2020), https://www.ixl.com/privacypolicy/serviceprivacypolicy.

institutions and parents to find and understand, what types of Student PII we collect, if any, and the purposes for which the information we maintain is used or shared with third parties."

- "We will support access to and correction of Student PII by the student or their authorized parent[.]"

- "We will incorporate privacy and security when developing or improving our educational products, tools, and services and comply with applicable laws."[33]

92.    IXL does not adhere to many of the commitments stated in the Privacy Pledge.

93.    Because of these deficiencies, IXL fails to obtain effective parental consent to its collection and use of children's and parents' personal information.

**4.    IXL fails to disclose risks that its data practices pose to children.**

94.    In order to support informed consent, IXL must disclose the potential benefits of its practices—as demonstrated by objective, verified, evidence-based research—against the potential harms those practices pose to children.

95.    IXL fails to disclose the material risks of harm that its data practices pose to children.

**i.    IXL's practices pose risks to children by compromising the security of their personal data.**

96.    By collecting vast amounts of data from both students and their families, IXL puts that data at risk.

97.    Rates of cybercrime are steadily rising, including mass data breaches.

98.    Schools and school districts have been particularly and increasingly targeted by cybercriminals in recent years, which has resulted in leaks of highly personal and sensitive information about children, some of which perpetrators have made publicly available.

99.    Such exposure can have immediate and long-term consequences for children. As explained by one cybersecurity professional, whose son's school was hacked, "It's your future. It's

---

[33] Student Privacy Pledge, K-12 School Service Provider Pledge to Safeguard Student Privacy 2020, https://studentprivacypledge.org/privacy-pledge-2-0/.

getting into college, getting a job. It's everything."[34]

100.    IXL's data practices unduly compromise the security of children's information. And the resulting harms and risks of harms are exacerbated by the sheer volume of data collected and the number of entities that receive access to it. Once such data is unlawfully obtained, the harms are irreversible.

101.    Families' data is further compromised by IXL's practice of providing access and otherwise sharing that information with a multitude of third parties.

102.    Parents have a right to understand the risks attendant to IXL's collection of their children's personal information and assess those risks against any purported benefits of such collection.

103.    Moreover, parents have a right to control what data is collected *and what is then done* with that data after it is collected.

### ii.    IXL poses risks to children by exposing them to dangerous persuasive design techniques.

104.    In addition to influencing decisionmakers, IXL's platforms manipulate children's behavior and areas of study and practice for the purpose of obtaining more of their data.

105.    These features include techniques variously described as persuasive design, manipulative design, coercive design, addictive design, and deceptive design techniques. Such techniques are engineered to steer individuals into engaging in behaviors that benefit corporate interests, such as unknowingly disclosing personal information, incurring unwanted charges, or compulsively using services.[35]

106.    In addition to influencing decisionmakers, IXL's platforms manipulate children's behavior using dangerous design techniques to promote maximum engagement for the purpose of obtaining more of their data.

---

[34] Natasha Singer, *A Cyberattack Illuminates the Shaky State of Student Privacy*, The New York Times (July 31, 2022), https://www.nytimes.com/2022/07/31/business/student-privacy-illuminate-hack.html.
[35] The Future of Manipulative Design Regulation, Future of Privacy Forum (January 10, 2023), https://fpf.org/blog/the-future-of-manipulative-design-regulation/.

107.    Based on the data IXL collects directly from children when they use its products, IXL's algorithms then begin nudging impressionable children into other "recommended" skill areas. Again, there is no parental oversight or even attempt at providing governance. Instead, IXL  outsources key decision-making to its algorithms, which are fueled by the vast amount of data that it collects from millions of people, employing the same practice against Class members without discrimination.

108.    IXL also encourages children to use its "Real-Time Diagnostic" using playful imagery and themes designed to appeal to even the youngest of children:



109.    IXL further encourages students to contribute data necessary for IXL to build a "personal study plan" for the NWEA Measures of Academic Progress ("MAP") assessment, another algorithmically driven assessment tool provided by a private, for-profit third party used to quantify and generate predictions about children's knowledge, understanding, performance, and potential.[36]

110.    IXL rewards children for providing IXL their data. Children can earn "awards" by engaging with IXL products, such as "stuffed animals" for pre-K children (which are actually just digital images of animals):

---

[36] Product Update, *Enhanced item selection algorithm for select MAP Growth tests*, NWEA Connection (March 15, 2023), https://connection.nwea.org/s/nwea-news/enhanced-item-selection-algorithm-for-select-map-growth-tests-summer-2023-MCGTVKSOZKPFFJ5HK3L53WY3SO34?language=en_US; Houghton Mifflin Harcourt, *NMH Completes Acquisition of NWEA*, PR Newswire (May 1, 2023), https://www.prnewswire.com/news-releases/hmh-completes-acquisition-of-nwea-301811887.html.



111.   Children are not able to understand these manipulative design techniques and make informed, self-interested decisions about whether to engage with the products and provide them personal data.

### iii.   IXL's practices pose risks to children by potentially limiting their access to information and opportunities.

112.   IXL uses student data to create products that purport to analyze and predict student performance and behavior.

113.   IXL markets these analytics to its customers for use in wide-ranging decision-making about children, a practice known as algorithmic profiling. Such analytics purport to help teachers and administrators "personalize" a child's curriculum and learning plan, understand a child's strengths and weaknesses, identify a student's individual education goals, formulate plans for reaching those goals, and a host of other predictions and recommendations for purportedly better management of the child.

114.   IXL's algorithms attempt to gather children's knowledge, understanding, and potential to reduce them to quantifiable analytics. In doing so, there is an inherent sacrifice of accuracy, nuance,

and privacy for efficiency, measurability, and scalability.

115.    These models define their own metrics, which IXL uses to justify their results, creating and perpetuating a pernicious and untested feedback loop.

116.    In addition to providing assessments of student language learning, Emmersion offers AI-generated language assessments to employers "to make hiring decisions fast."[37]

117.    By generating these predictions on which myriad third parties rely in making consequential decisions affecting children, IXL produces and sells the equivalent of credit reports on children in every domain over which IXL claims algorithmic expertise.

**B.    IXL does not obtain effective parental consent to the collection or use of children's or parents' data.**

118.    As previously detailed, IXL collects data directly from school-age children and their parents—including their sensitive personal and personally identifiable information—through their use of its products. And IXL retains, processes, and shares that data and its data-derivative products with a host of third parties for commercial purposes.

119.    Consent is effective only if the aggrieved person consented to the particular conduct, or to substantially the same conduct, and if the alleged tortfeasor did not exceed the scope of that consent.

120.    For consent to be actual, the disclosures must explicitly notify users of the specific conduct and practices at issue. Additionally, because minors are not legally competent to provide valid, binding consent, the collection of data from children requires parental consent.

121.    IXL at no time obtains actual consent from children or their parents for its collection or use of their data as described herein.

122.    Indeed, IXL purports to unilaterally relieve itself of any such duty to obtain consent through its Terms of Service, in which it states that "IXL assumes no responsibility for . . . failure to obtain the proper consent to collect, use, and share Student Data with IXL for IXL's subsequent use."

123.    IXL instead purports to shift the burden to schools to obtain the necessary consent for

---

[37] Emmersion: Automated Language Testing, https://emmersion.ai/.

IXL's collection and use of student data.

**1.      Schools do not own or control the data collected directly from children by IXL, nor have they acted as intermediaries for obtaining parental consent.**

124.    IXL claims that schools own and control student data.

125.    IXL alternatively states that a "[s]chool may authorize IXL to collect information from a child under 13.

126.    Schools do not own data collected directly from children.

127.    School administrators are not legal guardians of children.

128.    Neither children nor their data are the property of schools.

129.    Children's personal information belongs to children.

130.    Schools cannot legally consent to the direct collection or use of personal information about and belonging to children by a third party, particularly a privately owned, for-profit technology company for commercial purposes, even if such collection and use may confer a benefit to schools that is administrative, pedagogical, or otherwise.

131.    Schools do not control the collection, storage, or use of student data by IXL or any third party that IXL grants access to student data.

132.    For example, IXL states that, at the expiration of a school's subscription, IXL retains control of student data, which it "may delete" or grant the schools access to at IXL's sole discretion.

133.    In fact, schools do not have access to, or even knowledge of, the complete and ever-growing cache of data collected by IXL or its third-party affiliates or how IXL and its affiliates use that data.

134.    IXL's various methods of collecting, storing, processing, using, and disclosing student data are controlled by IXL and its third-party affiliates.

135.    Valuing the privacy of its own personal information, IXL refuses to disclose or describe these processes or permit review of them—by its customers or affected users—by claiming that it is proprietary information protected by intellectual property law.

136.    Further, schools do not obtain effective parental consent to IXL's collection and use of

student data as a parent's agent or intermediary, not least because schools lack the information necessary to support informed consent, as previously detailed herein.

137.    IXL thus collects and uses children's personal information without effective consent.

**2.      It is mechanistically *impossible* for parents to provide effective consent to IXL's data practices.**

138.    In addition to IXL's failure to provide sufficient information to even theoretically support consent, it is mechanistically impossible for a parent to consent to IXL's data practices.

139.    IXL's Terms of Service and related disclosures—at least the portions that are publicly available—are located on its website.

140.    IXL's Service Privacy Statement explains that, when a person accesses an IXL website, it begins collecting personal information "automatically."

141.    IXL's Service Privacy Policy further explains what information it collects automatically, including:

- how you access and use the Service (e.g., referring / exit pages and URLs);

- how frequently you access the Service;

- the pages you view;

- the links you click;

- other actions you take on the Service;

- information about your browser and information about the device(s) you use to access the Service, for example:

  - browser type;

  - browser language;

  - Internet service provider;

  - device type;

  - model and manufacturer; and

  - a unique ID that allows us to uniquely identify:

    - your browser;

- device;
- account;
- operating system brand and model; and
- whether you access the Service from multiple devices;
  - information about your geographical location data; and
  - analytics data.

142.   IXL's Service Privacy Policy further explains that it uses third party tools and technology to track and identify users, including:

- third-party analytics tools, such as Google Analytics, to help IXL measure traffic and usage trends for the Service and to understand more about the demographics and behaviors of its users; and

- third-party technologies, including the application of statistical modeling tools, which permit us to recognize and contact users across multiple devices.

143.   The data IXL collects about users when they interact with its website enables IXL and its third-party partners and affiliates to identify and target its users with precision for commercial purposes, including parents and their children.

144.   Even if IXL did provide the information necessary for a person to understand its byzantine privacy policies, it does not disclose that these practices occur across its website—*including its Terms of Service and related privacy policies*.

145.   As soon as a person interacts with any of these pages, IXL and numerous third parties begin collecting that person's data, rendering it impossible for them to review and agree to those terms before they are subjected to the data practices of IXL and myriad third parties.

146.   Further, IXL and third parties embed tracking technologies on the person's device that allow the person to be followed across the internet and even across other devices, including technologies that are designed to evade ad-tracking tools. This enables a visitor to be tracked long after they have navigated away from the website.

147.   IXL, through third-party advertising networks, uses the information it collects from

individuals who access its website "to direct our online advertisements to those people who may find them relevant to their interests," a practice known as behavioral advertising.

148.    IXL shifts the burden to users, including parents and children, to take measures to avoid receiving the targeted advertising facilitated by these technologies: "If you do not want to receive targeted advertising from IXL based on your visit to our website, you can use the below link to request that IXL take steps to prevent third-party advertising networks from using information about your visit to our website to display targeted IXL advertisements to you on other websites or services on behalf of IXL."

149.    However, IXL warns that it is "unable to respond to Do Not Track signals set by your browser at this time."

150.    Consequently, it is impossible for parents to consent to any of IXL's data practices because they begin even before a person has the opportunity to review IXL's Terms of Service or privacy policies.

### 3.    IXL steers children to its data-mining website.

151.    IXL also intends that children access its websites.

152.    IXL states that it "take[s] many steps to prevent these third-party advertising networks from collecting information for targeted advertising purposes once a subscriber to our Service signs into our Service," such as when a child accesses their school-licensed IXL dashboard.

153.    However, school-licensed IXL student accounts feature numerous, persistent links to IXL website pages:



Company | Blog | Help center | User guides | Tell us what you think | Testimonials | Contact us | Terms of service | **Privacy policy**

IXL LEARNING © 2024 IXL Learning. All rights reserved.

154.    When clicked, those links automatically open the IXL website in a child's browser without warning or request for parental consent. IXL's and third parties' tracking technologies get to work immediately, thereby substantially and irreversibly compromising the child's data and device.

155.    IXL and untold third parties then track children across the internet for the purpose of

collecting ever more data about them.

156.    Using the data it collects through these tracking technologies, IXL builds user profiles that reveal a child's interests, preferences, and habits over a significant amount of time—all without affording parents and children a meaningful opportunity to control or prevent the unauthorized exploration and exploitation of their private lives.

**C.    IXL does not provide students or their parents access to, control over, or information about the data IXL collects from them or the information associated with or generated from that data.**

157.    In addition to providing wholly deficient Terms of Use, IXL fails to provide parents access to, control over, or information about the data it collects from them or their children and the information associated with or generated using that data, as would be necessary to (1) ensure IXL's compliance with its terms of service and (2) supporting ongoing effective consent.

158.    IXL instead instructs parents to direct their inquiries to schools. But schools do not possess all of the information about IXL's data practices, nor do they possess, retain, control, or even have access to all the data collected, stored, processed, and used by IXL.

159.    IXL states that a parent may contact IXL about deleting personal information, but warns that it "may not be able to comply with your request in all circumstances."

160.    IXL states that it "will retain personal information for as long as needed to provide the Service and for our internal business purposes, which may extend beyond the termination or cancellation of your subscription or user account."

161.    Students and parents have no way of controlling—correcting, deleting, or otherwise modifying—their data obtained by IXL, or the predictions IXL's data-fueled algorithms purport to make about them and make available to a host of third parties.

162.    Students and parents do not and cannot know the full extent of the data IXL obtains about them, whether that data is accurate, how that data is stored, how long that data is retained, who has access to that data, or how that data or data-derivative information or products are used.

163.    Without any such access, control, or information, effective, ongoing consent to IXL's data practices is not possible.

**D.      IXL's Terms of Service are constantly changing without notice to, or consent from, parents.**

164.    The many documents that contain information about IXL's Terms of Service and privacy policies are constantly changing.

165.    IXL states that, if it makes material changes to its Terms of Service or privacy policies, it will notify the *school*—not parents—and let the *school* decide whether to allow IXL to use children's data in a new manner.

166.    It is also reasonable to assume that the various third-party agreements referenced throughout its terms of service and related disclosures are also subject to, and do routinely, change.

167.    But no matter how many times they change, IXL never fully discloses how they harvest, retain, and manipulate children's and parents' data for commercial purposes.

**IV.    IXL's conduct harms children and their parents.**

**A.      IXL's failure to obtain parents' informed consent to its collection and use of their data harms families.**

168.    IXL's conduct and practices, as described in this Complaint, irreparably damage Plaintiffs and Class members alike by invading their privacy and their ability to control their own personal rights and data.

169.    IXL's conduct and practices, as described in this Complaint, also harms Plaintiffs and Class members alike in the form of diminution of the value of their private and personally identifiable data and content.

170.    The inability to control this data and IXL's collection and use thereof further impedes Plaintiffs and Class members alike from controlling what is done with this data after it is taken by IXL.

171.    Whatever the potential benefits and risks that IXL's data practices pose to all education stakeholders—especially to students and parents—parents are entitled to be fully informed of those variables and, based on that information, decide whether to subject their families to those risks.

**B.     IXL's nonconsensual data practices harm children.**

172.    IXL's far-reaching and surreptitious data practices are not benign. Rather, they harm children—especially young children—and their parents in myriad ways that are immediate, significant, and long-lasting.

**1.     IXL harms children by subjecting them to marketing.**

173.    Advertising to children and teenagers is a multibillion-dollar industry. IXL's data practices enable children and their digital behaviors to be tracked for the purpose of creating and delivering targeted marketing campaigns by IXL and unidentified third parties.

**i.     Marketing is harmful to children.**

174.    A 2020 policy statement from the American Academy of Pediatrics ("AAP") describes the harms that the "datafication" of children and resulting digital advertising pose to children.[38]

175.    It explains that children's unique developmental needs, such as immature critical-thinking skills and impulse inhibition, leave them more vulnerable to the negative physical, mental, and financial health effects of digital marketing.

176.    It further explains that children do not comprehend the full complexity of how digital data are collected, analyzed, and used for commercial purposes.

177.    Children under age seven have limited ability to understand the persuasive intent (*i.e.*, that someone else is trying to change their thoughts and behavior) of the advertiser. Children ages seven to eleven lack the abstract thinking skills that help them recognize advertising as a larger commercial concept.

178.    Furthermore, recognition of persuasive intent does not necessarily lead to the ability to resist marketing, especially with highly appealing products. When advertising is linked to rewards or embedded in personalized digital platforms, children's abilities to identify or critically think about advertising messages is undermined.

---

[38] Jenny Radesky, et al., Digital Advertising to Children, American Academy of Pediatrics Council on Communications and Media (July 2020), https://downloads.aap.org/DOFA/AAP%20Surveillance%20Advertising%20Petition%20Comments _Final_1.26.22.pdf.

179.    The practice is so harmful to children that the AAP has called on the Federal Trade Commission to pass regulations banning surveillance advertising.[39]

180.    Similarly, a 2023 report issued by the American Federation of Teachers, in partnership with American Psychological Association ("APA") and others, similarly warns of the dangers of "personalized, data-driven marketing to minors."[40] It explains that "targeted advertising can be used to exploit young people's vulnerabilities" and calls on platforms to eliminate the practice.[41]

181.    The APA has also explained that youth are "biologically predisposed toward peer influence" and "sensitive to personalized content."[42] Consequently, "youth become especially invested in behaviors that will help them get personalized feedback, praise, or attention from peers."[43]

### ii.    IXL exposes children to exploitative marketing.

182.    As discussed, *supra*, IXL subjects children to targeted marketing on its own platforms, including use of peer testimonials and personalized content.

183.    As discussed, *supra*, IXL subjects children to behavioral marketing by facilitating their access to its public websites.

184.    IXL also admits that it "allow[s] certain third party advertising networks and other third party businesses to collect your personal information directly from your browser or device through cookies and related technologies for advertising, attribution, analytics and research purposes."

### 2.    IXL harms children by continuously surveilling them.

185.    Research has shown that persistent surveillance decreases opportunities for children

---

[39] American Academy of Pediatrics, Letter to Lina Kahn, Chair of the Federal Trade Commission (January 26, 2022), https://downloads.aap.org/DOFA/AAP%20Surveillance%20Advertising%20Petition%20Comments _Final_1.26.22.pdf.

[40] American Federation of Teachers, et al., Likes vs. Learning: The Real Cost of Social Media for Schools (2023), https://www.aft.org/sites/default/files/media/documents/2023/LikesVSLearning_Report.pdf.

[41] *Id.*

[42] American Psychological Association, Potential Risks of Content, Features, and Functions (April 2024), https://www.apa.org/topics/social-media-internet/youth-social-media-2024.

[43] *Id.*

to exercise autonomy and independence. Persistent surveillance hinders children's development of self-regulation and decision-making that are crucial to aspects of responsibility and self-identity.[44] Continuous surveillance can also increase passivity and self-censorship in children rather than genuine expression, compromising their rights to freedom of thought, conscience, communication, creativity, and speech.[45] It emphasizes compliance with current social order instead of the cultivation of identity and dignity.[46] And the oppressive potential of IXL's surveillance practices is proportional to the invisibility and pervasiveness of those practices.[47] Further, persistent surveillance at school normalizes surveillance in other areas of life, and trains children not to value their own and others' privacy and autonomy.[48] It also normalizes the exploitation of children, their personal information, and their educational development for third-party commercial gain without knowledge, consent, or compensation.[49]

186.    IXL constantly surveils children. IXL touts that its diagnostic product "works in the background to continuously update [student] results" to provide "a far clearer and more insightful portrait of students' knowledge" than other diagnostic tools.[50]

187.    By steering children to its website, IXL also subjects children to numerous tracking technologies that allow IXL and third parties track a child across the web in perpetuity.

188.    The datafication of a child and their learning process, for commercial purposes, brings about a social disempowerment that negatively affects the child's education in the moment of learning and also, therefore, the future of a free and sustainable society.[51] In other words, IXL's practices erode

---

[44] Caroline Stockman and Emma Nottingham, *Surveillance Capitalism in Schools: What's the Problem?*, Digital Culture & Education (2022) at 6.
[45] *Id*.
[46] *Id*.
[47] *Id*. at 3.
[48] Stockman, Nottingham, *supra*, at 6.
[49] *Id*. at 7.
[50] IXL Learning, Release of the IXL Diagnostic (August 21, 2017), https://www.ixl.com/assets/company/IXL_Releases_the_IXL_Diagnostic.pdf.
[51] *See, e.g.*, Nottingham, Stockman, Burke, *Education in a datafied world: Balancing children's rights and school's responsibilities in the age of COVID 19*, Computer Law & Security Review (July 2022) available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8958095/pdf/main.pdf.

the bedrock principles on which this country was founded. They are, in short, profoundly un-American.

**C.   IXL's nonconsensual data practices harm parents by abridging their right to parent as they choose.**

189.    IXL's data practices also infringe upon parents' rights to parent as they see fit, a right protected by the U.S. Constitution.

190.    The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

191.    The interest parents possess with regard to their children is a fundamental liberty interest protected by the Fourteenth Amendment.

192.    The Due Process Clause protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

193.    By denying parents control over their children's personal information—especially in a manner that compromises children's health, education, and opportunities—IXL violates that right.

194.    IXL's data practices and products further circumvent parental control by collecting, analyzing, and using children's data in ways that affect the information and opportunities available to them and decision-making about them, all without parental notice or consent.

195.    Furthermore, IXL denies parents the ability to review, modify, correct, delete, or otherwise control the data that is collected about their children.

196.    In conjunction with the right to make decisions about the care, custody, and control of their children, the Due Process Clause guarantees the right of parents and guardians to direct the upbringing and education of children under their control. Just as parents may not be forced to send their children to public school, they may not be forced to subject their children to harmful corporate surveillance and exploitation when they do.

**D.     IXL's nonconsensual data practices harm families.**

**1.     IXL harms families by invading their privacy.**

197.     When a person's privacy is invaded, the invasion is the harm. A right to privacy encompasses the individual's control of information concerning his or her person. Loss of such control harms a person's ability to, for example, manage and minimize risk.

198.     IXL's data practices forever wrest from parents and children control over their personal information.

199.     IXL continues to collect a person's information long after they log out of their school-licensed account or leave IXL's website. IXL employs this practice in order to continue harvesting data to feed its user dossiers. This tracking occurs no matter how sensitive or personal a person's online activities are—IXL's practices are indiscriminate. By correlating individuals' online activities—such as their browsing history—with other personal information, IXL collects additional data to add to its intimate profile of those individuals without valid consent.

200.     Further, IXL provides users no access to or control over their personal information.

201.     Privacy extends to vital rights such as freedom of thought, freedom from surveillance and coercion, protection of one's reputation, and protection against unreasonable searches and takings.

202.     As former FTC Commissioner Noah Joshua Phillips observed, "[t]he United States has a proud tradition of considering and protecting privacy, dating back to the drafting of the Constitution itself."[52]

203.     The information IXL collects is being used in countless ways that infringe upon the many time-honored privacy rights of a child and his or her parents.

---

[52] Noah Joshua Phillips, Taking Care: The American Approach to Protecting Children's Privacy, Federal Trade Commission (November 15, 2018 ),
https://www.ftc.gov/system/files/documents/public_statements/1422695/phillips_-_taking_care_11-15-18_0.pdf.

**2.      IXL's harms families by denying them access to their data and subjecting them to practices that are opaque, unreviewable, and unappealable.**

204.    IXL denies children and their parents the ability to access and review the data it takes from them and understand how their data is used and whom has access to it.

205.    Further, the algorithmic models on which IXL's products are built are entirely opaque.

206.    Families are thus unable to review the data collected and aggregated, the algorithmic models used to generate predictions, or the assumptions on which those models are based or otherwise understand how their data is processed, interpreted, and used.

207.    As previously discussed, schools and other third parties may rely on the data collected by IXL and the data-derived products generated by IXL to make decisions that affect children's lives now and in the future.

208.    IXL's practices harm families by denying them the ability to: (1) assert their rights by providing—or declining to provide—informed consent before their information is irreversibly compromised; (2) respond effectively to issues involving their personal information; or (3) make meaningful decisions regarding the collection, storage, and use of their information. They are also unable to know and object to the predictions generated by unknown data and to how third-parties might (and do) use those predictions.

209.    By denying families the ability to review and understand this information—thereby denying them the ability to identify, assess, and seek redress of attendant harms—these practices are deceptive, unfair, and unconscionable, especially given that IXL conscripts children into this opaque corporate apparatus without parental notice or consent in the first instance.

**3.      IXL harms families by forcing them to choose between a child's right to an education and other fundamental rights.**

210.    IXL forces families into the untenable position of having to choose between their right to an education and other fundamental rights, such as their rights to privacy and property.

211.    Recent research shows that nearly 80 percent of adults reported being very or

somewhat concerned about how companies use data collected about adults,[53] and the number of those concerned about their online privacy is growing quickly.

212.    Protective behaviors are on the rise, with 87 percent of US adults using at least one privacy- or security-protecting tool online.[54]

213.    An even greater percentage of parents value protecting their children's personal data, including their identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[55]

214.    By placing schools between itself and families, IXL has driven a wedge between school officials and parents, leaving parents reluctant to press their schools for information regarding IXL's data practices or request that their children be alternatively accommodated.

215.    Parents fear becoming adversarial with their children's schools and the possible repercussions they or their children might suffer if they are perceived as difficult or meddlesome, including stigmatization or retaliation. IXL has thus chilled parental efforts to inquire as to and object to its practices.

216.    Children and their parents are thus particularly vulnerable and disempowered to protect themselves against IXL's conduct.

217.    IXL should not be permitted to use schools as a shield against parent inquiry and concern and should be made to account for their data practices directly to those directly affected by them.

218.    IXL forces parents to choose between equal access to education on the one hand, and other basic rights belonging to themselves and their children, such as their rights to privacy and

---

[53] Brooke Auxier, et al., Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information, Pew Research Center (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.
[54] Olivia Sideot and Emily Vogels, What Americans Know About AI, Cybersecurity and Big Tech, Pew Research Center (August 17, 2023), https://www.pewresearch.org/internet/2023/08/17/what-americans-know-about-ai-cybersecurity-and-big-tech/.
[55] Polling Memo: Parents' Views on Children's Digital Privacy and Safety, Trusted Future (2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/.

property on the other.

        **4.**     **IXL harms families by failing to compensate them for their property and labor.**

219.    Personal data is now viewed as a form of currency. There has long been a growing consensus that consumers' sensitive and valuable personal information would become the new frontier of financial exploitation.

220.    Furthermore, most U.S. consumers value their data and their privacy. Accordingly, an overwhelming majority engage in efforts to protect their data: 86 percent of U.S. consumers report caring about data privacy and wanting more control; 79 percent are willing to spend time and money to protect their data; and nearly half have terminated relationships with both online and traditional companies over data-privacy concerns, especially younger consumers.[56]

221.    The information IXL collects has significant economic value.[57] It logically follows that IXL's data-derived predictions thus have even more significant economic value.

222.    IXL profits from users by acquiring their sensitive and valuable personal information, which includes far more than mere demographic information perhaps necessary for obtaining consent, such as name, birth date, and email address.

223.    Further, when users access IXL sites and products, IXL secretly embeds numerous tracking mechanisms on users' computers and web-browsers, which allow IXL and third parties to track users' browsing histories and correlate them with user, device, and browser IDs.

224.    These practices circumvent users' efforts to prevent others from accessing their data.

225.    IXL's actions have thus caused Plaintiffs and putative class members economic injury.

226.    By collecting, using, and disclosing Plaintiffs' information, IXL diminished the value

---

[56] Cisco, Consumer Privacy Survey (2021), *available at*:
https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[57] *See, e.g.*, Brendan Hesse, Get Paid to Watch Ads in the Brave Web Browser, Life Hacker (April 26, 2019), https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279; The More You Share, the More You Earn, Reklaim, https://www.reklaimyours.com/how-to-earn; Kevin Mercadante, 10 Apps for Selling Your Data for Cash, Wallet Hacks (November 18, 2023), https://wallethacks.com/apps-for-selling-your-data/.

of that information and Plaintiffs' future property interest.

227.    IXL's actions caused damage to and loss of Plaintiffs' and Class members' property and their right to control the dissemination and use of their personal information.

**E.      IXL's nonconsensual data practices are unfair and unlawful.**

228.    IXL has generated massive profit through collection and analysis of Plaintiffs' personal information—without Plaintiffs' knowledge or consent, and without compensating them for the value of that information.

229.    This one-sided arrangement—whereby IXL earns vast revenues each year from the personal information of children and their parents gathered through the compelled use of IXL products, and all children and parents receive in return is an education to which they are already legally entitled—is particularly unjust given the core philanthropic purpose and compulsory nature of a public education.

230.    Through its false representations and surreptitious data practices, IXL is unjustly enriching itself at the cost of children's and their parents' privacy, security, and autonomy, when children and their parents would otherwise have the ability to choose how they would monetize their own data—or decide not to. School-aged children and their parents should not be made to bear these risks and harms for the benefit of a private, for-profit corporation.

**V.      Plaintiff-Specific Allegations**

**A.      Plaintiffs use IXL products, which collect and use Plaintiffs' data.**

231.    Plaintiffs use IXL platforms, such as IXL Language Arts and Math.

232.    Those platforms are owned, controlled, and operated by IXL.

233.    Plaintiffs' dashboards include and reveal highly personal, detailed, sensitive information, such as progress reports that detail their academic performance.

234.    IXL has shared and continues to share Plaintiffs' data across its suite of products.

235.    IXL processes and uses information generated, uploaded, or stored in IXL databases, including data and information about and belonging to Plaintiffs, for commercial purposes.

236.    IXL uses this information to develop, improve, and market its products and other

commercial purposes.

237.   IXL uses Plaintiffs' data generated and/or provided by schools to develop its analytics tools, which it sells to Plaintiffs' school and school district.

238.   IXL has provided third parties data belonging to Plaintiffs for commercial purposes, including identification, advertising, targeting, influence, and decision-making purposes.

**B.     Plaintiffs did not consent to IXL's collection and use of their data.**

239.   Plaintiffs did not provide effective, informed, voluntary, and ongoing consent to IXL's collection and use of their data for any purpose, let alone commercial purposes.

240.   Plaintiffs were never provided all material terms regarding IXL's data practices, such as what of their personal information that IXL is collecting, how it is used, who else can access and has accessed it, or the risks of harm those practices pose to Plaintiffs.

241.   Plaintiffs were unable to obtain information relating to or arising from IXL's collection or use of their data.

242.   Plaintiffs were unaware that IXL's website contained dozens of hidden tracking technologies—including the pages containing its Terms of Use and related disclosures—that immediately and permanently permitted a host of third parties to track and surveil them.

243.   Thus Plaintiffs did not consent to IXL's data practices, and any purported consent (Plaintiffs contend there is none) was not informed, voluntary, or commensurate with IXL's level of surveillance and profiteering.

**C.     IXL denied Plaintiffs access to, review of, and control over their data.**

244.   Plaintiffs requested access to the data IXL collected from them.

245.   IXL responded by refusing to provide Plaintiffs such access and instead directing Plaintiffs to contact their schools about obtaining access.

246.   On information and belief, schools do not have access to or control over all of the data that IXL collects from and about students and their families.

**D.     Plaintiffs were harmed by IXL's collection and use of their data.**

247.   IXL's data practices harmed Plaintiffs in a number of material if often opaque ways.

Because IXL refuses to disclose information critical to a meaningful understanding its data practices, discovery is necessary to fully understand and identify the nature and details of these harms.

248.    IXL's data practices subjected Plaintiffs to exploitative marketing practices.

249.    IXL harmed Plaintiffs by invading their privacy.

250.    IXL's data practices have compromised Plaintiffs' relationships with various school administrators, faculty, and staff.

251.    IXL harmed Plaintiffs by diminishing the value of their data.

252.    IXL harmed Plaintiffs by denying them access to their own data.

253.    IXL harmed Plaintiffs by denying them control over their own data.

254.    IXL harmed Plaintiffs by subjecting them to unfair, deceptive practices that have prevented them from understanding the full extent of how they may have been harmed by those practices.

255.    IXL harmed Plaintiffs by failing to compensate them for their property or labor, which it has used to fuel its highly lucrative business.

## CLASS ACTION ALLEGATIONS

256.    This is a class action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All individuals whose information was intercepted, received, or collected by IXL from May 7, 2020, through the present (the "Class Period").

257.    Excluded from the Class are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their chambers and families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, or legal representatives; (3) persons who properly and timely request exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Class counsel, and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded person.

258.   **Ascertainability**: Membership of the Class is defined based on objective criteria and individual members will be identifiable from IXL's records, including from IXL's massive data storage. Based on information readily accessible to it, IXL can identify members of the Class who have used IXL's products.

259.   **Numerosity**: Each member of the Class likely consists of at least thousands of individuals.  Accordingly, members of the Classes are so numerous that joinder of all members is impracticable. Class members may be identified from IXL's records.

260.   **Typicality**: Plaintiffs' claims are typical of the claims of other Class members, as all members of the Classes were uniformly affected by IXL's wrongful conduct in violation of federal and state law as complained of herein.

261.   **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations. Plaintiffs and their counsel have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

262.   **Commonality**: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a.   Whether IXL represented that Class Members could control what data were intercepted, received, or collected by IXL;

b.   Whether IXL gave the Class members a reasonable expectation of privacy that their data was not being intercepted, received, or collected by IXL;

c.   Whether IXL actually intercepted, received, or collected data from Class members;

d.   Whether IXL's practice of intercepting, receiving, or collecting users' data violated state and federal privacy laws;

e.   Whether IXL's practice of intercepting, receiving, or collecting users' data violated state and federal anti-wiretapping laws;

f.   Whether IXL's practice of intercepting, receiving, or collecting users' data violated any other state and federal tort laws;

g.   Whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

h.     Whether Plaintiffs and Class members have sustained damages as a result of IXL's conduct and, if so, what is the appropriate measure of damages or restitution.

263.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

264.   **California Law Applies to All Class Members**: California's substantive laws apply to every member of the Class, regardless of where in the United States the Class member resides. Defendant's own Terms of Service explicitly requires users to "agree that: (i) the Service shall be deemed solely based in California; and (ii) the Service shall be deemed a passive one that does not give rise to personal jurisdiction over IXL, either specific or general, in jurisdictions other than California. The Agreement shall be governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles." By choosing California law for the resolution of disputes covered by its Terms of Service, IXL concedes that it is appropriate for this Court to apply California law to the instant dispute to all Class members. Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class members under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by the Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair. Defendant's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible. The application of California laws to the Classes is

also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes and California has the greatest interest in applying its laws here.

265.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### Count I: Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*

266.    Plaintiffs incorporate by reference paragraphs 1 through 265 as though fully set forth herein.

267.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

268.    The Wiretap Act protects both the sending and receipt of communications.

269.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

270.    IXL's actions in intercepting and tracking user communications was intentional. Upon information and belief, IXL is aware that it is intercepting communications and has taken no remedial actions.

271.    IXL's interception of internet communications that the Plaintiffs and Class members were sending and receiving was done contemporaneously with the Plaintiffs' and Class members' sending and receipt of those communications.

272.    The communications intercepted by IXL included "contents" of electronic communications made from the Plaintiffs and Class members to websites and other web properties other than Defendant's in the form of detailed URL requests, webpage browsing histories, search queries, and other information that Plaintiffs and the Class members sent to those websites and for which Plaintiffs received communications in return from those websites.

273.    These transmissions were tracked and intercepted without authorization and are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

274.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.      The computer codes and programs that IXL used to track the Plaintiffs' and Class members' communications;

b.      The Plaintiffs' and Class members' browsers and mobile applications;

c.      The Plaintiffs' and Class members' computing and mobile devices;

d.      Defendant's servers; and

e.      The plan that Defendant carried out to effectuate its tracking and interception of the Plaintiffs' and Class members' communications.

275.    IXL, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 U.S.C. § 2510(12) and is used elsewhere in the Wiretap Act. IXL was not acting as an Internet Service Provider (ISP).

276.    IXL was not an authorized party to the communications because the Plaintiffs and Class members were unaware of IXL's interceptions and did not knowingly send any communications to IXL when IXL intercepted the communications between the Plaintiffs and web properties other than IXL's. IXL could not manufacture its own status as a party to the Plaintiffs' and Class members' communications with others by surreptitiously redirecting or intercepting those communications.

277.    Plaintiffs and Class members did not consent to IXL's continued gathering of the user's communications.

278.    After intercepting the communications, IXL then used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a).

279.    As a result of this conduct, the Court may assess statutory damages to Plaintiffs and

Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by IXL in the future, and reasonably attorneys' fees and other litigations costs reasonably incurred.

**Count II: Violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632**

280.  Plaintiffs incorporate by reference paragraphs 1 through 265 as though fully set forth herein.

281.  The CIPA is codified at Cal. Penal Code §§ 630–638. The Act begins with its statement of purpose in Cal. Penal Code § 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

282.  Cal. Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars[.]

283.  Cal. Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars[.]

284.    Under either section of the CIPA, a defendant must show it had the consent of all parties to a communication.

285.    IXL has its principal place of business in California; designed, contrived, and effectuated its scheme to track users from California; and has adopted California substantive law to govern its relationship with its users.

286.    IXL's non-consensual tracking of the Plaintiffs' and Class members' internet communications was without authorization and consent from the Plaintiffs and Class members. The interception by IXL in the aforementioned circumstances were unlawful and tortious.

287.    The following items constitute machines, instruments, or contrivances under the CIPA, and even if they do not, IXL's deliberate and purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner":

   a.    The computer code and programs IXL used to track Plaintiffs' and Class members' communications;
   b.    The Plaintiffs' and Class members' browsers and mobile applications;
   c.    The Plaintiffs' and Class members' computing and mobile devices;
   d.    IXL's servers;
   e.    The computer codes and programs used by IXL to effectuate its tracking and interception of the Plaintiffs' and Class members' communications; and
   f.    The plan IXL carried out to effectuate its tracking and interception of the Plaintiffs' and Class members' communications.

288.    The data collected by IXL constituted "confidential communications" as that term is used in Section 632, because Plaintiffs and Class members had objectively reasonable expectations of privacy in their devices and activity.

289.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personally identifiable information.

290.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of Cal. Penal Code §§ 631 and 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**Count III: Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code §§ 502, *et seq.***

291.     Plaintiffs incorporate by reference paragraphs 1 through 265 as though fully set forth herein.

292.     Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

293.     IXL violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and Class members' data.

294.     IXL effectively charged Plaintiffs and Class members and was enriched by acquiring their sensitive and valuable personal information without permission and using it for IXL's own financial benefit to advance its business interests. Plaintiffs, their children, and Class members retain a stake in the profits that IXL earned from the misuses of their activity and personally identifiable information because, under the circumstances, it is unjust for IXL to retain those profits.

295.     IXL accessed, copied, took, analyzed, and used from Plaintiffs' and Class members' computers in and from the State of California, where IXL: (1) has its principal place of business; (2) upon information and belief used servers that provided communication links between Plaintiffs' and Class members' computers and IXL, which allowed IXL to access and obtain their data; and (3) IXL's Terms of Service mandate that the provision of IXL's service is "deemed solely based in California" thus foreclosing any suggestion that the service is based anywhere else. Accordingly, IXL caused the access of their computers from California, and is therefore deemed to have accessed their computers in California.

296.     As a direct and proximate result of IXL's unlawful conduct within the meaning of Cal. Penal Code § 502, IXL has caused loss to Plaintiffs and Class members and has been unjustly enriched in an amount to be proven at trial.

297.     Plaintiffs, on behalf of themselves and Class members, seek compensatory damages

and/or disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

298.    Plaintiffs and Class members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because IXL's violations were willful and, upon information and belief, IXL is guilty of oppression or malice as defined by Cal. Civil Code § 3294.

299.    Plaintiffs and Class members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

**Count IV: Invasion of Privacy**

300.    Plaintiffs incorporate by reference paragraphs 1 through 265 as though fully set forth herein.

301.    California's constitution creates a right of action against private entities such as IXL that are headquartered in and do business in the state of California.

302.    Plaintiffs' and Class members' expectation of privacy is deeply enshrined in California's Constitution. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possession, and protecting property and pursuing and obtaining safety, happiness, and privacy." The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972.

303.    The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating:

> The right of privacy is the right to be left alone…It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

304.     The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including IXL.

305.     A California constitutional privacy claim requires an invasion of: 1) a legally protected privacy interest; 2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and 3) conduct by the defendant constituting a serious invasion of privacy.

306.     As described herein, IXL has intruded upon the following legally protected privacy interests:

a.      The Federal Wiretap Act as alleged herein;
b.      The California Wiretap Act as alleged herein;
c.      A Fourth Amendment right to privacy contained on personal computing devices, including all of their activity on their devices, as explained by the United States Supreme Court in the unanimous decision of *Riley v. California*; and
d.      The California Constitution, which guarantees a right to privacy.

307.     Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiffs and Class members could not reasonably expect that IXL would commit acts in violation of federal and state civil and criminal laws.

308.     IXL's actions constituted a serious invasion of privacy in that it:

a.      Invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including web search, browsing histories, and other activities to which IXL had no legitimate basis for accessing;
b.      Violated laws, including the Federal Wiretap Act and California Invasion of Privacy Act;
c.      Invaded the privacy rights of Plaintiffs and Class members without their consent;
d.      Constituted an unauthorized taking of valuable information from Plaintiffs and Class members through deceit;
e.      Further violated Plaintiffs' and Class members' reasonable expectation of privacy via IXL's review, analysis, and subsequent uses of Plaintiffs' and Class members' activity that was considered sensitive and confidential.

309.     Committing these acts against Plaintiffs and Class members alike constitutes an egregious breach of social norms that is highly offensive.

310.     IXL's surreptitious and unauthorized tracking of Plaintiffs' and Class members'

activity constitutes an egregious breach of social norms that is highly offensive, particularly given that IXL's products and services were represented as tools to assist with the educations of children.

311.   Taking this information through deceit is highly offensive behavior, and IXL lacked any legitimate business interest in tracking Plaintiffs and Class members without their consent.

312.   Plaintiffs and Class members have been damaged by IXL's invasion of their privacy and are entitled to just compensation and injunctive relief.

**Count V: Intrusion Upon Seclusion**

313.   Plaintiffs incorporate by reference paragraphs 1 through 265 as though fully set forth herein.

314.   Plaintiffs asserting claims for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

315.   In carrying out its scheme to conscript parents and their children into the IXL universe of products to enable IXL to track and intercept Plaintiffs' and Class members' communications in violation of its own privacy promises, IXL intentionally intruded upon the Plaintiffs' and Class members' solitude or seclusion in that it effectively placed itself in the middle of conversations to which it was not an authorized party.

316.   IXL's tracking and interception were not authorized by the Plaintiffs and Class members.

317.   IXL's intentional intrusion into their internet communications and their computing devices and web-browsers was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individual privacy and against theft.

318.   The taking of personally identifiable information from Americans through deceit is highly offensive behavior.

319.   IXL's continued collection of data after Plaintiffs and Class members navigated away from IXL's websites and to wholly different and unrelated websites is highly offensive behavior as that collection has no bearing on the application of IXL's products to children's education.

320.   Wiretapping and surreptitious recording of communications is highly offensive

behavior.

321.    Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is further heightened when children are using the internet.

322.    Plaintiffs and the Class members have been damaged by IXL's invasion of their privacy and are entitled to reasonable compensation including but not limited to disgorgement of profits related to the unlawful internet tracking.

**Count VI: Violation of California's Unfair Competition Law ("UCL") Cal. bus. & Prof. code § 17200, *et seq.***

323.    Plaintiffs incorporate by reference paragraphs 1 through 265 as though fully set forth herein.

324.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL).  By engaging in the practices aforementioned, IXL has violated the UCL.

325.    IXL's conduct violated the spirit and letter of these laws, which protect property, economic and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information.

326.    IXL's unfair acts and practices include its violation of property, economic, and privacy interests protected by federal and state laws. To establish liability under the "unfair" prong, Plaintiffs and Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

327.    Plaintiffs and Class members have suffered injury-in-fact, including the loss of money and/or property as a result of IXL's unfair and/or unlawful practices, to wit, the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by IXL, particularly the predictive models. Plaintiffs and Class members have suffered harm in

the form of diminution of the value of their private and personally identifiable data and content.

328.    IXL's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

329.    IXL reaped unjust profits and revenues in violation of the UCL. This includes IXL's profits and revenues from their targeted-advertising and improvements of IXL's other products. Plaintiffs and the Class seek restitution and disgorgement of these unjust profits and revenues.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and against IXL as follows:

A.    An award of damages, including actual, compensatory, general, special, incidental, consequential, and punitive damages, in an amount to be determined at trial;

B.    Injunctive, declaratory, and other equitable relief as is appropriate;

C.    Pre- and post-judgment interest to the extent provided by law;

D.    Attorneys' fees to the extent provided by law;

E.    Costs to the extent provided by law; and

F.    Such other relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated: May 7, 2024

Respectfully submitted,

By: /s/ Michael F. Ram

Julie Liddell (*pro hac vice* forthcoming)
julie.liddell@edtech.law
**EDTECH LAW CENTER PLLC**
P.O. Box 300488
Austin, TX 78705
Telephone: (737) 351-5855

Michael F. Ram (CA Bar No. 104805)
mram@forthepeople.com
**MORGAN & MORGAN**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6923

Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com

**MORGAN & MORGAN**
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*