UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRETCHEN SHANAHAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>IXL LEARNING, INC.,<br><br>    Defendant. | Case No. 24-cv-02724-RFL<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND DENYING MOTION TO DISMISS WITHOUT PREJUDICE**<br><br>Re: Dkt. No. 19, 24 |

    Plaintiffs Gretchen Shanahan, Amy Warren, and Kimberly Whitman, on behalf of themselves and their minor children, have brought a putative class action suit against IXL Learning, Inc. ("IXL"), alleging that it collected and monetized the data of millions of school-age children who used the IXL platform without parental consent and in violation of the Federal Wiretap Act and various state laws. Plaintiffs' children attend two public school districts in Kansas that use IXL products as part of their curriculum.

    IXL now moves to compel arbitration on the basis that the school districts agreed to arbitration with IXL, and that this agreement binds all parents of the students in those school districts, including Plaintiffs. In essence, IXL argues that, simply by virtue of sending their children to public school, Plaintiffs have assented to arbitrate any claims they have with IXL. Neither the Children's Online Privacy Protection Act ("COPPA") nor common-law agency principles support IXL's contention that school districts act as agents of parents when contracting with educational vendors. Moreover, even if such an agency relationship existed, it is not "usual and necessary" for a school district to enter into arbitration agreements on behalf of students or their parents to carry out the purposes of any such agency relationship. IXL also argues that Plaintiffs have ratified the arbitration agreements by being aware of IXL's terms of

use and allowing their children to continue to attend public schools where the use of IXL tools is allegedly a mandatory part of the curriculum. IXL, however, fails its burden to demonstrate that the continued use of those tools was voluntary and constituted consent to the terms of the arbitration agreement. Accordingly, for the reasons further detailed below, IXL's motion to compel arbitration is **DENIED**.

## I.   FACTUAL BACKGROUND

IXL presents evidence that, when the school districts were purchasing its services, IXL presented the school districts with Terms of Service ("Terms") containing an arbitration provision.[1] The Terms state that they apply to "all visitors, users, and others who access or otherwise use the Service." (Dkt. No. 19-1 ("Exhibit A") at 4.)[2] The Terms further warn prospective users to "not use or access (or continue to access) the Service" if a user does "not agree to any of the terms in this Agreement." (Exhibit A at 8.) There is no evidence that either IXL or the school districts ever presented the Terms either to Plaintiffs specifically or to students and their parents generally.

On the first page, the Terms provide:

> "THIS AGREEMENT CONTAINS A MANDATORY INDIVIDUAL ARBITRATION AND CLASS ACTION/JURY TRIAL WAIVER PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS."

(Exhibit A at 1.) That provision requires arbitration of "any claim, dispute, or controversy . . . arising out of or in connection with or relating to this agreement." (Exhibit A at 10.)

---

[1] Plaintiffs contend that IXL fails to present evidence of a contract between IXL and Plaintiffs' school districts. (Dkt. No. 27 at 9–11.) While IXL's evidence is not a model of clarity, the Court concludes that there is sufficient proof to demonstrate the school districts' assent to the Terms. There is evidence that IXL presented some version of the Terms to the Kansas school districts when they purchased access to IXL's services. (Dkt. No. 19-3 ¶ 2.) From the school districts' subsequent adoption of IXL tools, it can be inferred that the districts assented to the Terms. Moreover, IXL submits evidence that the terms presented to the school districts were substantially similar to the Terms quoted in their briefing and in this opinion. (Dkt. No. 19-1 ¶ 2–3.)

[2] Page numbers reflect the pagination applied by the court's electronic case filing system.

In a separate section entitled "ELIGIBILITY AND AUTHORITY," the Terms further state:

> The U.S. Children's Online Privacy and Protection Act ("COPPA") requires that online service providers obtain verifiable parental consent before collecting personal information from children under 13. If you are a School providing the Service to children under 13, you represent and warrant that you have the authority to provide consent on behalf of parents for IXL to collect information from students under 13 before allowing such students to access our Service. We recommend that all Schools provide appropriate disclosures to students and parents regarding their use of service providers such as IXL and that they provide a copy of our Privacy Policy and the IXL Learning Student Data Privacy Pledge to parents.

(Exhibit A at 4.)

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate disputes arising from "a contract evidencing a transaction involving commerce" shall be "valid, irrevocable, and enforceable."  9 U.S.C. § 2.  "The court's role under the [FAA] is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  When deciding whether the parties agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts."[3]  *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1063 (9th Cir. 2020).  The party seeking to compel arbitration bears the burden as to both elements.  *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).   Courts apply "a summary judgment type standard when ruling on a motion to compel arbitration."  *Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1045 (S.D. Cal. 2021) (citations omitted).

---

[3] The parties agree that California law applies.  (Dkt. No. 32 at 2 n.1.)

### III.   DISCUSSION

#### A.   Whether the School Districts Consented to Arbitration on Behalf of Plaintiffs as Their Agents.

The general rule is that that only a party to an arbitration agreement may enforce it. *Soltero v. Precise Distribution, Inc.*, 102 Cal. App. 5th 887, 898–99 (2024). California courts, however, have enforced arbitration agreements against nonsignatories when there is "an agency or similar relationship between [a] nonsignatory and one of the parties to the arbitration agreement." *NORCAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 76 (2000). IXL argues that the school districts consented to arbitrate on Plaintiffs' behalf when they signed vendor contracts with IXL because they acted as Plaintiffs' agents. This argument is not persuasive.

#### 1.   COPPA Does Not Authorize School Districts to Agree to Arbitration on Behalf of Parents Without Their Assent.

##### a.   COPPA Does Not Create an Agency Relationship.

Contrary to IXL's argument, the Children's Online Privacy Protection Act ("COPPA") does not create an express agency between the school districts and their students. COPPA, passed in 1998, aims to protect the privacy and personally identifying information of children and imposes certain requirements on operators of online services directed to children under thirteen years of age. 15 U.S.C. § 6502. IXL identifies no language in COPPA, 15 U.S.C. § 6501 et seq., or the COPPA Rule, 16 C.F.R part 312, designating school districts as agents of parents when signing contracts with educational vendors.

IXL relies principally upon a response from the Federal Trade Commission ("FTC") to a comment during the notice-and-comment process for the COPPA Rule. The FTC, which is responsible for COPPA enforcement actions and publishes guidance on the rule, stated that the Rule "does not *preclude* schools from . . . serving as the parents' agent" in agreeing to allow collection of their children's personal information. 64 Fed. Reg. 59888, 59903 (Nov. 3, 1999) (emphasis added). "For example, many schools already seek parental consent for in-school Internet access at the beginning of the school year." *Id.* As the FTC points out in its amicus brief, that does not mean that the COPPA Rule, by default, requires or establishes an agency

relationship between the parties, without obtaining any consent from the parents.  (Dkt. No. 31 at 5.)

IXL also points to an FTC blog post stating that "[i]n the educational context, however, schools can consent on behalf of parents to the collection of student personal information - but only if such information is used for a school-authorized educational purpose and for no other commercial purpose."  Lisa Weintraub Schifferle, *COPPA Guidance for Ed Tech Companies and Schools during the Coronavirus*, Federal Trade Commission: Business Blog (Apr. 9, 2020), https://perma.cc/NGU5-7HZY.  A blog post, of course, cannot create a legally enforceable agency relationship that is not discussed in the governing statute or its implementing regulation.  Moreover, the cited passage does nothing more than reaffirm what the FTC stated in its comment:  that COPPA does not *preclude* schools from forming an agency relationship with parents with respect to collection of student data.

Indeed, IXL's reading of COPPA would directly undermine its primary statutory purpose: to "protect children's online privacy by requiring verifiable parental consent before an operator [of online services] collects personal information."  *See* Children's Online Privacy Protection Rule, 78 Fed. Reg. 4001 (Jan. 17, 2013) (amending 16 C.F.R. § 312).  Under IXL's view, school districts would be authorized to sign away any privacy rights of children under thirteen without consulting their parents because of the agency relationship created by COPPA, even though no similar authority would exist for high school students over thirteen, to whom COPPA would not apply.  IXL identifies no basis to read COPPA to create such a perverse scheme.

        **b.**    **Even If COPPA Created an Agency Relationship, That Relationship Would Not Encompass Authorizing School Districts to Consent to Arbitration.**

Even if the COPPA Rule created an agency relationship on its own without requiring any notice to the parents or assent from them, the language in the FTC commentary above is expressly limited to allowing schools to act as agents of parents for purposes of complying with COPPA's requirements for collecting data from minors.  This lawsuit does not involve any claim

5

against IXL for violating COPPA's requirements.

IXL contends, however, that the authority to consent to data collection on behalf of parents *impliedly* authorizes school districts to also consent to arbitration. An agent has implied authority to do everything "necessary or proper and usual, in the ordinary course of business, for effecting the purpose of their agency." *See* 2B Cal. Jur. 3d Agency § 65. But consenting to an arbitration agreement is in no way a "necessary" component of consenting to data collection on behalf of parents and students. *Crypto Asset Fund, LLC v. OPSkins Group Inc.*, 478 F. Supp. 3d 919 (C.D. Cal. 2020), the case IXL cites for this proposition, is inapposite. In *Crypto Asset Fund*, the court found that the agent—acting on behalf of the plaintiff in a cryptocurrency token transaction—had actual authority to purchase such tokens from the defendants on the plaintiffs' behalf, and thus had implicit authority to sign an arbitration agreement during that transaction. *Id.* That situation stands in sharp contrast to this case. While an agent might need to sign an arbitration clause to complete a transaction requested by a cryptocurrency buyer, the school district does not need to sign an arbitration agreement in order to consent to collection of data about a student.

IXL separately claims that the reasoning behind COPPA's data collection consent scheme—specifically, that it would be infeasible to obtain consent from each parent individually—supports school districts' authority to also consent to arbitration on behalf of students. IXL points to the following language in a notice of proposed rulemaking seeking to modify the COPPA Rule:

> After careful consideration of the comments, the Commission proposes codifying in the Rule its long-standing guidance that schools, State educational agencies, and local educational agencies may authorize the collection of personal information from students younger than 13 in very limited circumstances . . . . The need for parental consent [to the collection of student data] is also likely to interfere with educators' curriculum decisions . . . [because] [i]n situations where some number of parents in a class decline to consent to their children's use of ed tech, schools would face the prospect of foregoing particular services for the entire class or developing a separate mechanism for those students whose parents do not consent.

6

89 Fed. Reg. 2034, 2055 (Jan. 11, 2024) (footnotes omitted).  But there is no indication that the FTC intended for this statement, which is not reproduced in the COPPA rule itself or any other binding authority, to reach beyond the student data collection context and authorize school districts to consent to any and all provisions in a vendor agreement on behalf of parents.  Indeed, the FTC's amicus brief repeatedly disclaims any such intent.  (Dkt. No. 31 at 5-8.)

### c. The Terms Do Not Evidence Parents' Agreement to Allow the School Districts to Assent to Arbitration on Their Behalf.

At oral argument, IXL advanced for the first time yet another theory of authority: that the Terms represent that the school districts have authority to consent to data collection on behalf of parents.  Specifically, IXL relies on the following sentence: "If you are a School providing the Service to children under 13, you represent and warrant that you have the authority to provide consent on behalf of parents for IXL to collect information from students under 13 before allowing such students to access our Service."  (Exhibit A at 4.)  This argument is waived because it was never raised in the briefs.  *See Ramirez v. Salvation Army*, No. C06-0631 TEH, 2006 WL 1867722, at *9 (N.D. Cal. July 6, 2006) ("[T]he Court need not consider an issue . . . raised for the first time at oral argument.").  Moreover, even if the argument were preserved, IXL cannot rely on the school districts' apparent authority to consent on behalf of parents.  To bind the parents to the arbitration agreement, IXL must show that the *parents'* conduct caused the school districts or IXL to believe that the school districts had authority to bind the parents.  *Rogers v. Roseville SH, LLC*, 75 Cal. App. 5th 1065, 1074–75 (2022).  Finally, even if the school districts had actually obtained the required authorization from the parents to consent to data collection, that still does not mean the parents impliedly authorized the school districts to consent to arbitration.  For the same reasons as stated above, it is not necessary for school districts to agree to arbitration on behalf of parents in order to consent to student data collection.

### 2. Common-Law Agency Principles Do Not Authorize the School Districts to Agree to Arbitration on Behalf of Parents.

Following the FTC's submission of its amicus brief, IXL suggested for the first time in its reply brief that there is also a common-law agency relationship between the school districts and

parents that impliedly authorizes the school districts to enter into arbitration agreements on their behalf. IXL vacillated at oral argument as to whether it was indeed advancing such a claim. To the extent that IXL is still pursuing the argument, it is waived because it was raised for the first time on reply. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Moreover, even if the argument were not waived, IXL fails to demonstrate either a common-law agency relationship or sufficient scope of authority under such an agency relationship.

IXL does not demonstrate that the school districts formed a common-law agency relationship with the parents. "[T]he concept of agency posits a consensual relationship in which one person … acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person. The person represented has a right to control the actions of the agent." *Hernandez v. Meridian Mgmt. Servs., LLC*, 87 Cal. App. 5th 1214, 1220–21 (2023) (quoting Restatement (Third) of Agency § 1.01 cmt. c). "A relationship is not one of agency within the common-law definition unless the agent consents to act on behalf of the principal, and the principal has the right throughout the duration of the relationship to control the agent's acts" *Id.* "Control is a concept that embraces a wide spectrum of meanings, but within any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms." *Id.* (citing Restatement (Third) of Agency § 1.01 cmt. f). Here, there is no evidence that Plaintiffs directed or controlled the school districts' decisionmaking as to *how* to provide educational services, *which* educational vendors to engage, or *what* terms should be included in their vendor contracts. Nor is there any evidence that Plaintiffs dictated what the school district should or should not do in its selection of vendors or contracting with those vendors, in specific or general terms. *See Soltero v. Precise Distribution, Inc.*, 102 Cal. App. 5th 887 (2024) (finding no agency relationship where no evidence principal exerted control over the agent).

Even assuming an agency relationship is present, IXL has not shown that signing an arbitration agreement on the students' and their parents' behalf is within the scope of the school districts' agency. IXL argues that in order for school districts to provide educational services, it

8

is both "usual and necessary" for them to consent to arbitration agreements that bind students and parents, and not just the school district, in connection with the provision of those services. (Dkt. No. 32 at 4.)  But it is hard to see why it would be "necessary" for parents and students to surrender their jury trial rights and consent to arbitration in order to obtain educational services from the school district.  IXL identifies no basis for the Court to reach that conclusion.

*Logan v. Country Oaks Partners, LLC*, 82 Cal. App. 5th 365 (2022), is instructive.  In that case, the plaintiff had designated his nephew as his health care agent and attorney-in-fact, granting him the express authority to "make health care decisions." *Id.* at 371.  After the plaintiff was admitted to a nursing facility, the nephew-agent executed an arbitration agreement with that facility on the plaintiff's behalf. *Id.* at 369.  The California Court of Appeal held that the agent's authority to make healthcare decisions on a principal's behalf did not include the authority to execute the arbitration agreement with the nursing home. *Id.* at 375.  "That an agent is permitted to make healthcare decisions to the same extent as the principal," the court explained, "says nothing about the agent's authority to agree to enter into an arbitration agreement and thereby waive the principals' right to a jury trial." *Id.* at 372.  Similarly, here, the decision to waive a jury trial and instead engage in binding arbitration is not a decision about how or what educational services to provide.  Rather, it is a decision about how disputes over educational decisions—with a third party—will be resolved.  And that decision is out of the scope of any authority Plaintiffs have granted their school districts. *Id.* at 372; *cf. Madden v. Kaiser Foundation Hospitals*, 17 Cal. 3d 699 (1976) (finding that an express agency agreement authorizing the negotiation of contracts provided implied authorization for the agent to agree to arbitration and other dispute resolution procedures on behalf of the principal).

IXL further argues that if signing arbitration agreements is out of the scope of the school districts' authority, software vendors like IXL would effectively be prevented from applying *any* of their terms of use—*i.e.*, restrictions on uploading infringing intellectual property, prohibitions on sublicensing or reverse engineering, or indemnification for willful misuse—to their end users. But nothing prevents the school districts from agreeing to those provisions with IXL, and then

9

imposing classroom rules to uphold the school districts' obligations to IXL. Nor does this ruling put arbitration on less than "equal footing," as IXL contends. (Dkt. No. 32 at 4.) All terms, including the arbitration provisions, are subject to the same requirements: The school districts may bind parents and students only to the extent that the school districts act as their agents subject to their control, and even then, only to the extent that consent to the terms at issue is within the scope of the agency.

### 3. IXL's Request for Discovery Is Waived and, in Any Event, Insufficiently Supported.

In passing, IXL requests an opportunity to conduct discovery if there is a "disputed question of fact as to what is 'usual and necessary' to provide educational technology like that licensed from IXL." (Dkt. No. 32 at 4.) This argument is waived, as it was raised for the first time on reply. *See Zamani*, 491 F.3d at 997. Moreover, even factual findings that would be most favorable to IXL's position—*i.e.*, that all educational technology vendors would refuse to provide services unless the arbitration agreements in their contracts also bound parents and students—would not change the outcome. IXL has not demonstrated that the school districts acted as parents' agents when procuring educational technology, as explained above, so additional discovery on the scope of that agency is futile. IXL's request for such discovery is thus denied. *See Stirrup v. Educ. Mgmt. LLC*, No. CV-13-01063-TUC-CRP, 2014 WL 4655438, at *2 (D. Ariz. Sept. 17, 2014) (the court decides the question of whether the parties agreed to arbitrate on summary judgment if there is no dispute of material fact, otherwise the court conducts a jury or bench trial).

### B. Whether Plaintiffs Ratified the Terms by Continuing to Send Their Children to Schools Where IXL Services Were Being Used.

IXL also advances a second theory for why its arbitration agreement with the school districts should bind the parents. IXL contends that Plaintiffs ratified the Terms, including the arbitration agreement, when they continued to send their children to schools where IXL was allegedly a mandatory component of the curriculum. While it may be true that Plaintiffs had knowledge of the Terms at least by the time they decided to file the present suit, their children's

continued use of IXL services in school did not constitute assent to the Terms. "As the party alleging the existence of a contract, [IXL] has the burden to prove each and every element of a valid contract—including mutual assent." *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082 (9th Cir. 2020). California law provides that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Cal. Civ. Code § 1589. But IXL has failed to show that Plaintiffs' continued use of IXL was voluntary. Enrollment in public school is mandatory in Kansas. Kan. Stat. § 72-3120. IXL relies on Plaintiffs' allegations that that their children continue to use the software in school. (Dkt. No. 19 at 7.) However, IXL produces no evidence that this ongoing use is voluntary for either the students or their parents. In short, a parent's decision to not pull their child out of public school or tell them to stop using a platform that is part of the curriculum does not constitute voluntary acceptance of the benefits—and burdens—of using IXL products.

IXL further contends on reply that Plaintiffs separately assented to the Terms via the "browsewrap" agreement on IXL's site. Specifically, IXL points to the Ninth Circuit's decision in *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014), which held that browsewrap agreements may be enforceable when a user has sufficient notice of the terms of agreement and manifests assent by continuing to use the website. But again, IXL has not presented proof that Plaintiffs' voluntary assent to the Terms can be inferred from the act of sending their children to public schools that use IXL. That does not constitute the "unambiguous" assent required for Plaintiffs to be bound by a website's terms and conditions. *Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849, 857 (9th Cir. 2022).

## IV.    CONCLUSION

For the reasons described above, IXL's Motion to Compel Arbitration (Dkt. No. 19) is **DENIED.** At oral argument, the Court asked if it should withhold ruling on the motion to dismiss if the motion to compel arbitration was denied, in order to allow IXL to exercise its right to an immediate appeal under 9 U.S.C. § 16 before proceeding with the litigation on the merits.

IXL requested that the Court do so. Plaintiffs objected, arguing that even if IXL were to prevail on appeal, their claims for "public injunctive relief" would remain non-arbitrable under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 962 (2017). The injunctive relief sought in this case, however, is private injunctive relief on behalf of a class of similarly situated persons and is not "public injunctive relief." *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 543 (9th Cir. 2021) ("[W]hen the injunctive relief being sought is for the benefit of a discrete class of persons, or would require consideration of the private rights and obligations of individual non-parties, it has been held to be private injunctive relief."). Accordingly, the Court will not hear the motion to dismiss on the merits at this time to allow IXL to seek an immediate appeal as to its motion to compel arbitration. The motion to dismiss (Dkt. No. 24) is **DENIED WITHOUT PREJUDICE** to being renewed by re-noticing the motion (without re-filing it) following completion of any appeal. IXL's deadline to respond to the complaint is **STAYED** until 21 days after the time to appeal this Order has elapsed or, if an appeal is taken, after all appeals have been completed.

**IT IS SO ORDERED.**

Dated: November 1, 2024

RITA F. LIN
United States District Judge